**In re ALL TRAC TRANSPORTATION, INC., Debtor.**

**All Trac Transportation, Inc., Plaintiff,**

**v.**

**Transportation Alliance Bank, Defendant.**

**Bankruptcy No. 02–37005–SAF–11. Adversary No. 02–3390.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

Feb. 17, 2004.

**870**

Duncan McMillan, Rosa R. Orenstein, Orenstein and Associates, Dallas, TX, Timothy J. Vineyard, Sr., Higier, Lautin, Foxman, McKinney & Owen, PC, Addison, TX, for All Trac Transportation, Inc., Mansfield, Allied Capital Partners, L.P., Plaintiffs.

Jaime Myers, Winstead, Roger J. Allen, Winstead, Sechrest and Minick, Dallas, TX, for Transportation Alliance Bank, Defendant.

### MEMORANDUM OPINION AND ORDER

STEVEN A. FELSENTHAL, Chief Judge.

In this adversary proceeding, All Trac Transportation, Inc., the plaintiff/debtor, contends that Transportation Alliance Bank (TAB), the defendant, violated the automatic stay imposed by the Bankruptcy Code and failed to comply with several court orders. All Trac asserts that TAB's actions disrupted All Trac's cash flow, ulti-

mately resulting in the demise of All Trac's long haul trucking transportation business. All Trac requests that the court hold TAB in civil contempt of court for the alleged stay and order violations and impose compensatory damages of lost net past profits and lost net future profits. In addition, All Trac contends that TAB tortiously interfered with All Trac's contracts with its drivers, customers and lender. TAB denies that it violated the automatic stay or any court order and that it tortiously interfered with any All Trac contract. TAB argues that All Trac requests an inappropriate measure of damages and failed to meet its burden of proving damages.

The court conducted an eighteen-day trial over several months. This memorandum opinion contains the court's findings of fact and conclusions of law. Bankruptcy Rule 7052. The enforcement of the automatic stay and of court orders entered during a bankruptcy case constitutes a core matter over which this court has jurisdiction to enter a final judgment. 28 U.S.C. §§ 157(b)(2)(A), (G) and (M) and 1334. A claim for tortious interference with contracts during the administration of a Chapter 11 case and in connection with alleged violations of the automatic stay also constitutes a core matter. 28 U.S.C. § 157(b)(2)(A); *see Southmark v. Coopers & Lybrand,* 163 F.3d 925, 930–31 (5th Cir.1999) (state law cause of action inseparable from bankruptcy administration becomes core matter).

A stark contrast colors the parties' perspectives of their actions during the All Trac bankruptcy case. All Trac blames the entire failure of its transportation business on TAB. TAB responds that it acted consistently with the ordinary course of business between the parties, which it asserts this court authorized. All Trac maintains that TAB deprived All Trac of access

to funds necessary for post-petition operations. TAB replies that twice during All Trac's first month of operations it voluntarily agreed to factor post-petition accounts. Rather than cause All Trac's problems, TAB asserts it provided financing necessary to prevent immediate and irreparable harm to All Trac's business following the filing of All Trac's bankruptcy petition. And, yet, while TAB provided this financing, virtually simultaneously, it undertook collection activities inconsistent with the Bankruptcy Code. All Trac had to navigate its operational decisions between TAB's contradictory actions. Nevertheless, All Trac has the burden of proof on its claims. In the end, to prevail, All Trac must meet its burden of proof.

## Background

All Trac had been in the long haul transportation business. From 1994 through April 2003, All Trac utilized tractors and trailers in the trucking transportation business.

TAB is an FDIC-insured bank, headquartered in Ogden, Utah, with customers in the trucking industry. TAB is a subsidiary of Flying J, Inc. Transportation Clearing House, LLC (TCH), is a subsidiary of Flying J that supplies fuel for Flying J and its customers. Beginning in May 1999, the parties stipulate that TCH acted as the agent and for the benefit of TAB with respect to All Trac.

All Trac had a line of credit with TCH to be used to purchase fuel, repairs and related goods and services in connection with All Trac's trucking business. TCH assigned a written fuel line credit agreement to TAB on May 1, 1999. TAB extended the fuel line of credit to $40,000. TCH issued fuel cards to All Trac's drivers for the purchase of fuel and cash advances. The cards work similar to credit cards. All Trac paid for the credit by automatic drafts from its banking account at TAB.

By contract dated November 21, 2001, entitled "Accounts Receivable Purchase and Security Agreement," All Trac and TAB entered a factoring agreement. TAB purchased accounts receivable from All Trac. TAB generally paid 85% of the purchase price for the account at the time of purchase. TAB held the remaining 15% of the purchase price in a reserve account, subject to collection by TAB of the purchased account. Upon collection, TAB paid All Trac the remaining 15% of the purchase price, less a service fee. The parties stipulate that the purchased accounts were the subject of a sale transaction, and not the subject of a secured loan transaction.

TAB purchased most, but not all, of All Trac accounts receivable. Under the contract, TAB collected the non-purchased accounts. All Trac granted TAB a security interest in the non-purchased accounts. TAB held collections of the non-purchased accounts in the reserve account, making the funds available for All Trac's use as requested.

All Trac maintained a demand account at TAB, which it used as a checking account for operational expenses. TAB charged a fee for funds in the demand account. To avoid the fee, All Trac transferred funds from the reserve account to the demand account as needed. TAB maintained an online information system. All Trac could daily monitor the online information to assess checks presented for payment. If All Trac lacked sufficient funds in the demand account to cover checks for clearing the next day, TAB would transfer funds from the reserve account into the demand account to cover the checks.

According to Richard Frakes, All Trac's president and owner, in 2002, All Trac had been struggling with a $20,000 monthly

cash flow shortage. Frakes attributed the cash flow problems to the cost of fuel. All Trac cut operating costs and consolidated management functions. All Trac attempted to increase charges to its customers to cover the fuel costs and to renegotiate the lease agreements and purchase money loans for its rolling stock. But, after consultation with several creditors, on August 13, 2002, All Trac filed a petition for relief under Chapter 11 of the Bankruptcy Code.

### Automatic Stay

■ The bankruptcy petition operates as a stay applicable to all entities of certain activities, including exercising control over property of the bankruptcy estate, enforcing a lien against property of the bankruptcy estate, collecting or recovering a pre-bankruptcy petition claim and assessing a setoff of pre-petition obligations. 11 U.S.C. § 362(a)(3), (4), (5), (6) and (7). A violation of the automatic stay in a corporate debtor bankruptcy case may be sanctioned by a civil contempt proceeding. *First RepublicBank Corp. v. NCNB Texas Nat'l Bank (In re First RepublicBank Corp.)*, 113 B.R. 277, 278–79 (Bankr. N.D.Tex.1989). All Trac contends that TAB committed 1,423 acts in violation of the automatic stay.

### Court Orders

On August 14, 2002, All Trac filed an emergency motion to use TAB's cash collateral and for approval of interim post-petition factoring with TAB. In its motion, All Trac stated "that to continue the proper operation and management of [its] business operations and its property, and to enable [it] to effectuate a viable plan of reorganization," All Trac needed to use its accounts receivable "in a manner substantially consistent with [its] normal course of conduct, in order to meet not only the month-to-month operating budget of the Debtor ..., but more importantly the day to day operations of the Debtor's trucking business." All Trac further represented that its "fleet of trucks are always on the road across the country. Such trucks will not be able to refuel out on the road without approval of the use of its accounts receivable and financing which TAB provides through the Factoring Agreement and the Fuel Agreement." All Trac submitted a proposed budget with the motion. The budget allotted $40,000 for fuel charges from August 14, 2002, through August 24, 2002. All Trac requested that the court grant emergency relief for ten days. Bankruptcy Rule 4001(b)(2) and (c)(2).

The court held a hearing on the emergency motion on August 15, 2002, following which, the court granted bench relief, and, on August 16, 2002, the court entered an interim order approving use of cash collateral and interim post-petition factoring. The court found that All Trac had an immediate need for use of cash collateral in order to continue operation of, and avoid immediate and irreparable harm to, its business. All Trac represented to the court that it required the use of cash collateral in accordance with the budget attached to the motion. TAB advised the court that, "in order to minimize the disruption to [All Trac] as a going concern and to maintain the status quo during the outset of [the] chapter 11 case, TAB consents to [All Trac's] use of the Cash Collateral and or [sic] sale of the post-Petition Date accounts receivable to it for the next ten (10) days as long as such sale is substantially under the same terms and conditions as existed prior to the Petition Date and as [the] Court may order." Interim Order Approving Emergency Motion for Authority to Use Cash Collateral and Approve Interim Post–Petition Factoring Agreement, entered August 16, 2002, finding ¶ 11. The court thereupon granted the motion. The court ordered that All Trac

"is authorized to sell to TAB, for the ten (10) day period following the date this Order is signed, under the same terms [and] conditions as set forth in the Factoring Agreement and the Fuel Agreement, its post Petition Date accounts receivable." *Id.,* order ¶ 2. The court further ordered that the "automatic stay provisions of 11 U.S.C. § 362 are lifted and terminated to enable TAB to implement the provisions of this Order and otherwise thereby permitting TAB to purchase accounts of [All Trac], to receive collections on account of Collateral, and to apply those collections to the outstanding Obligations." *Id.,* order ¶ 6. Neither the motion nor order define "Obligations." The motion did not request and the court did not order the assumption of either the Factoring Agreement or the Fuel Agreement pursuant to 11 U.S.C. § 365.

On August 23, 2002, the court held a second interim hearing on All Trac's motion to use cash collateral and approve post-petition factoring. All Trac requested relief for two weeks, covering August 24, 2002, through September 7, 2002. TAB consented to All Trac's use of cash collateral and the sale of post-petition accounts to TAB "as long as such sale is substantially under the same terms and conditions as existed prior to the Petition Date and as [the] Court may order." Second Interim Order Approving Emergency Motion for Authority to Use Cash Collateral and Approve Interim Post–Petition Factoring Agreement, entered August 26, 2002, finding ¶ 11. By the Second Interim Order, entered August 26, 2002, the court authorized All Trac to use cash collateral to pay the expenses set forth on a budget for the period attached as Exhibit A to the court's order. Among other items, the budget set fuel charges for the two weeks at $63,000, or $4,500 per day. The court authorized All Trac "to sell to TAB, for the two (2) week period following the date this

Order is signed, under substantially the same terms [and] conditions as set forth in the Factoring Agreement and the Fuel Agreement, its post Petition Date accounts receivable." *Id.,* order ¶ 2. The court "lifted and terminated" the automatic stay "to enable TAB to implement the provisions of this Order and otherwise thereby permitting TAB to purchase post Petition Date accounts of [All Trac], to receive collections on account of Collateral, and to apply those collections in the ordinary course of business to the outstanding obligations." *Id.,* order ¶ 6. The August 26 order changed the authorization for TAB "to apply collections to the outstanding Obligations" from the first interim order entered August 16, 2002, to "apply those collections *in the ordinary course of business* to the outstanding obligations." (emphasis added). The court did not order the assumption of either the Factoring Agreement or the Fuel Agreement pursuant to § 365. The parties agreed to extend the provision of the order to September 9, 2002. The court did not enter an order reflecting that extension agreement.

On September 6, 2002, All Trac filed a motion to enter a post-petition factoring agreement with Allied Capital Partners, L.P. (the "Allied motion"). The court held a preliminary hearing on the Allied motion on September 9, 2002, following which the court entered an interim order authorizing All Trac to enter an interim factoring and security agreement with Allied to October 4, 2002. The court set a final hearing on the Allied motion on October 3, 2002.

On September 23, 2002, All Trac filed the instant adversary proceeding against TAB. On October 1, 2002, the court entered an agreed order regarding All Trac's application for a temporary restraining order. The order adopted several stipulations by All Trac, TAB and Allied. TAB agreed that it had no interest in any All

Trac receivable from and after September 11, 2002, and further agreed that Allied would be the sole owner or hold a first lien on those receivables. Allied agreed, in turn, that it had no interest in any All Trac receivable before September 11, 2002, and that TAB was the sole owner or had a first lien on those receivables. If the court granted a second lien deed of trust on All Trac's real property, Allied agreed to purchase all the outstanding and unpaid TAB accounts and TAB's security interest in TAB accounts. Upon the purchase, TAB agreed to assign the accounts to Allied. TAB agreed that Allied would collect all of All Trac's accounts receivable, including TAB accounts. Allied would forward funds for TAB accounts to TAB. If any TAB account remained unpaid ninety days after the entry of the agreed temporary restraining order, All Trac would purchase the account from TAB. For a ninety-day period, All Trac agreed to pay Allied a fee of 3% of the receivables, rather than the contract rate of 2.5%. All Trac and TAB terminated their banking relationship. All Trac further agreed not to purchase fuel and obtain driver advances or truck repairs from TAB. By separate court order, also entered October 1, 2002, the court directed that All Trac's shippers and customers send payments directly to Allied for all accounts receivable sold to TAB and Allied.

The court held the final hearing on the Allied motion on October 3, 2002, at which the court extended All Trac's authority to factor accounts receivable with Allied until October 15, 2002, and continued the hearing to October 15, 2002. After the hearing on October 15, 2002, the court extended the authority to factor with Allied to October 21, 2002, by an order entered October 18, 2002. On October 21, 2002, the court entered a final order on the Allied motion. In the order, the court provided that "[t]he TAB Accounts may be presently encumbered with liens or security interests in favor of TAB ..., which ... may be released or assigned to [Allied] if [Allied] purchases such accounts or if [TAB] is paid in full." Final Order Granting Emergency Motion for Authority to Enter Into Factoring and Security Agreement, to Grant Post Petition Lien and Supplement Thereto, entered October 21, 2002, order ¶ 2.

On March 4, 2003, All Trac filed its first amended complaint in this adversary proceeding with a motion for order to show cause why TAB should not be held in contempt of court. All Trac alleged that TAB violated the automatic stay and the above-described court orders and that TAB tortiously interfered with its contracts with its customers, employees, Allied and other secured creditors.

**Stay Violations and Contempt of Court**

All Trac contends that TAB should be held in civil contempt of court for violating the automatic stay and for violating court orders.

 In the Fifth Circuit, a violation of the automatic stay is voidable, not void. *Chapman v. Bituminous Ins. Co. (In re Coho Resources, Inc.)*, 345 F.3d 338, 344 (5th Cir.2003). As such, actions taken in violation of the stay are subject to discretionary cure by the court. *Id.; Picco v. Global Marine Drilling Co.*, 900 F.2d 846, 850 (5th Cir.1990); *Sikes v. Global Marine, Inc.*, 881 F.2d 176, 178 (5th Cir. 1989). In the first amended complaint, All Trac does not request that the court void any stay violation or otherwise cure a violation. Instead, with its motion for contempt, All Trac requests that the court hold TAB in contempt of court. *First RepublicBank Corp.*, 113 B.R. at 278 (holding that civil contempt constitutes a necessary and appropriate remedy for violation of the automatic stay in the case of

a corporate debtor). *See also In re San Angelo Pro Hockey Club, Inc.*, 292 B.R. 118, 124 (Bankr.N.D.Tex.2003) (court may award damages to corporate debtor in exercise of its civil contempt or equitable powers).

■ A bankruptcy court may issue any order, including a civil contempt order, necessary or appropriate to carry out the provisions of the Bankruptcy Code. *Placid Ref. Co. v. Terrebonne Fuel & Lube, Inc. (In re Terrebonne Fuel & Lube, Inc.)*, 108 F.3d 609, 613 (5th Cir.1997). The court has inherent authority to enforce its own orders. The court may enforce its orders by civil contempt proceedings.

■ In a civil contempt proceeding, All Trac must establish " 'by clear and convincing evidence: (1) that a court order was in effect, (2) that the order required certain conduct by [TAB], and (3) that [TAB] failed to comply with the court's order.' " *American Airlines, Inc. v. Allied Pilots Ass'n.*, 228 F.3d 574, 581 (5th Cir. 2000). The provisions of § 362(a) of the Bankruptcy Code stand as a court order, the automatic stay constituting a Congressionally-imposed, self-executing injunction. *San Angelo Pro Hockey Club*, 292 B.R. at 124.

■ All Trac contends that TAB may be held in contempt for violating the automatic stay even if TAB has not acted willfully. For civil contempt of a court order, All Trac need not show that the conduct was willful so long as the "contemnor actually failed to comply with the court's order." *American Airlines*, 228 F.3d at 581. For a stay violation, All Trac need not show that TAB intended to violate the stay. Rather, All Trac must show that TAB intentionally committed the acts which violate the stay. But for contemptible conduct warranting a sanction of damages, All Trac must show that TAB had

notice of the bankruptcy petition. *San Angelo Pro Hockey Club*, 292 B.R. at 127. A finding of willfulness is not necessarily a prerequisite to damages for contempt. *Id.* Nevertheless, in determining whether damages should be awarded under the court's contempt powers, the court considers whether TAB's conduct constitutes a willful violation of the stay. *Id.* at 124. "Willfulness within the context of an alleged stay violation is almost universally defined to mean intentional acts committed with knowledge of the bankruptcy petition." *Id.*

### Pre-petition Fuel Charges

Following the filing of the bankruptcy petition on August 13, 2002, TAB paid the following pre-petition fuel charges All Trac incurred with TCH: August 13, 2002, $3,090.23; August 14, 2002, $13,353.52; August 15, 2002, $3,266.80; and August 16, 2002, $4,623.75. Except for the August 13, 2002, payment, TAB used property of the bankruptcy estate to pay the pre-petition debt owed to its agent, TCH.

■ Funds collected post-petition by TAB from pre-petition All Trac accounts constitute property of the bankruptcy estate. 11 U.S.C. § 541(a). In the case of purchased accounts, funds deposited in the reserve account comprise the remaining purchase price owed to All Trac. In the case of serviced but non-purchased accounts, the funds deposited in the reserve account comprise All Trac's property, subject to TAB's lien. In either case, All Trac's interest in the deposits constitutes property of the estate. Without leave of court, TAB may not exercise control over that property. 11 U.S.C. § 362(a)(3).

■ In addition, TAB may not transfer funds to pay its pre-petition debt. Outside of a Chapter 11 plan of reorganization confirmed by the bankruptcy court,

the Bankruptcy Code does not provide for the pre-plan payment of pre-petition unsecured debt. *Capital Factors, Inc. v. Kmart Corp.*, 291 B.R. 818 (N.D.Ill.2003). This court has crafted a narrow judicial exception based on the doctrine of necessity. *In re CoServ, L.L.C.*, 273 B.R. 487 (Bankr.N.D.Tex.2002). All Trac did not seek leave from the court to authorize the payment of any pre-petition debt under the *CoServ* standard. As the court observed in *CoServ*, a creditor's insistence on payment of pre-petition debt to do business with a Chapter 11 debtor may amount to a violation of the automatic stay. 273 B.R. at 494.

John Conklin, TAB's vice president and general counsel, and Frakes both described the process for paying fuel charges by All Trac. After an All Trac driver makes a fuel charge, TAB implements an automatic withdrawal of the charge from All Trac's account. TCH issues a draft notification. The draft notification shows the "draft date," which is the date the draft amount will be withdrawn from All Trac's account with TAB. The automatic withdrawal occurs at midnight of the "draft date."

■ Debtor's exhibit 79 shows a draft notification dated August 12, 2002. The draft date and the pay date of this draft notification was August 13, 2002. The amount reflected on this draft notification would be withdrawn from All Trac's account with TAB at midnight on August 13, 2002. All Trac filed its bankruptcy petition at 4:11 p.m. on August 13, 2002. The stay did not apply at the time of the payment on August 13, 2002.

All Trac contends that its counsel, Rosa Orenstein, informed TAB on August 13, 2002, of the filing of the bankruptcy petition that day. However, Conklin testified that he learned of the bankruptcy filing at approximately 8:00 a.m. mountain standard time on August 14, 2002. Orenstein did not testify. Conklin testified that he did not talk to debtor's counsel until August 14. Frakes testified that on August 13 he told Mark Tague, a TAB field representative, of the bankruptcy filing. Frakes understood that Tague would inform TAB. Tague did not testify. Conklin did not know of any TAB person who learned of the filing before the early morning of August 14. On this evidence, the court finds that TAB did not learn of the filing of All Trac's bankruptcy petition until the morning of August 14, 2002. Thus, even if the stay applied to the August 13 payment of fuel charges, without notice of the filing of the case on August 13, 2002, TAB's payment of the fuel charges on August 13, 2002, would not amount to a contemptible violation of the automatic stay.

■ As found above, All Trac filed its emergency motion to use TAB's cash collateral and to factor with TAB post-petition on August 14, 2002. The motion represented that All Trac desired to use its accounts receivable "in a manner substantially consistent with [All Trac's] normal course of conduct" to meet the daily needs of its operating budget. Debtor's Emergency Motion for Authority to Use Cash Collateral and Approve Interim Post–Petition Factoring Agreement, filed August 14, 2002, ¶ 11. Specifically, All Trac represented that its trucks would be unable to refuel on the road without approval of the use of All Trac's accounts and TAB's financing as provided through the pre-petition Factoring Agreement and Fuel Agreement. The court set a hearing on the motion on August 15, 2002. During the day of August 14, 2002, Conklin and Orenstein reached an agreement on the use of cash collateral and post-petition factoring for ten days. Conklin understood that All Trac would ask the court on August 15,

2002, to authorize TAB to act consistently with pre-petition practices.

Nevertheless, on August 14, 2002, the court had not authorized All Trac to use cash collateral or to factor with TAB post-petition. Payment of pre-petition fuel charges on August 14, 2002, violated the automatic stay.

However, under the fuel payment procedure, the August 14, 2002, payment would have occurred at midnight, approximately eight hours before TAB had notice of the bankruptcy petition. Consequently, the payment of the pre-petition fuel charges on August 14, 2002, while violating the automatic stay, did not amount to a contemptible violation of the stay.

 On August 15, 2002, TAB paid pre-petition fuel charges of $3,266.80. On August 16, 2002, TAB paid pre-petition fuel charges of $4,623.75. Conklin testified that on August 14, 2002, he and Orenstein agreed that TAB would continue to perform post-petition as it did pre-petition. After the use of a fuel card, All Trac authorized an ACH system debit from its demand account at TAB to pay the charges at TCH, as found above. Conklin assumed that upon entry of a court order, that process would continue.

In its emergency motion filed August 14, 2002, All Trac presented a budget for fuel charges of $40,000 for the ten-day period of August 14 through August 24, 2002. Conklin testified that the $40,000 budget reflected the pre-petition credit limit of $40,000 under the Fuel Agreement. TAB consented to the use of cash collateral and agreed to purchase All Trac's receivables "substantially under the same terms and conditions as existed" pre-petition. The court granted All Trac's requested interim relief from the bench at the hearing on August 15, 2002. The court, in its order entered August 16, 2002, authorized All Trac to sell receivables to TAB "under the same terms and conditions as set forth in the Factoring Agreement and the Fuel Agreement." The court modified the stay to allow TAB to apply "collections to the outstanding Obligations."

Frakes testified that he assumed the pre-petition fuel charges would be paid in a plan of reorganization. He further assumed that post-petition collections would not be applied to pay those pre-petition fuel charges but would instead be available for All Trac's operating expenses. Conklin testified, on the other hand, that he assumed that TAB could apply post-petition collections to the fuel charges submitted pre-petition, so long as TAB did so consistent with the parties' pre-petition practice.

Although the court's order did not assume the Factoring Agreement or the Fuel Agreement, it did modify the stay to allow collections to be applied to "outstanding Obligations." Although "Obligations" is not defined in the order or the motion, it may be fairly read to apply to TCH fuel charges. In its motion, All Trac expressly discussed its immediate need to be able to refuel by factoring with TAB through the Factoring Agreement and Fuel Agreement. Reading the court's order in that context, TAB could reasonably conclude that the court modified the automatic stay to allow payment of the fuel charges. 11 U.S.C. § 362(d)(1). Consequently, All Trac has not established by clear and convincing evidence that the stay was in effect. Alternatively, the court cannot conclude that TAB willfully violated the automatic stay by paying TCH for pre-petition fuel charges on August 15, 2002, and August 16, 2002. Without a willful act, the court would not likely award contempt damages.

### License Plates

██ Pre-petition, All Trac negotiated an agreement with TAB for the payment

of license plate fees to the State of Oklahoma Tax Commission. With Conklin's approval, TAB advanced funds above the 85% payment advance for purchased accounts to cover the license plate fees. On February 22, 2002, TAB transferred $58,447.34 to Oklahoma to pay the fees. TAB established a separate All Trac reserve account for the advance. All Trac agreed to repay the $58,447.34 advance by weekly debits of $1,250 from its reserve account.

On August 16, 2002, TAB debited All Trac's reserve account in the amount of $11,456.47 to repay itself for the balance of the pre-petition license plate fee advance. Gary Harding, TAB's operations manager, testified that he and Conklin decided to pay the license plate fee balance because All Trac had breached its agreement with TAB by filing the bankruptcy petition. Harding conceded that TAB did not provide All Trac with notice that it would debit the reserve account to pay the pre-petition debt. Consequently, All Trac did not authorize the use of its funds to pay the outstanding balance on the pre-petition debt.

The court did not authorize that transfer of All Trac's interest in property. The advance to pay the license plate fees amounted to an extraordinary transaction between the parties, not an ordinary advance. The court's order entered August 16, 2002, cannot fairly be read to modify the stay to allow TAB to apply collections to pay an extraordinary obligation. TAB deliberately acted to use its control of All Trac's property to pay the pre-petition debt to TAB.

TAB willfully violated the automatic stay when it paid the pre-petition license plate fee debt by exercising control over property of the bankruptcy estate and by collecting pre-petition debts.

## Recoupment

TAB contends that the doctrine of recoupment shields the application of the post-petition funds to pre-petition fuel debts from the automatic stay. Recoupment by a creditor does not violate the automatic stay. *Kosadnar v. Metropolitan Life Ins. Co. (In re Kosadnar)*, 157 F.3d 1011, 1016 (5th Cir.1998). On the other hand, the automatic stay applies to setoff by a creditor. *Holford v. Powers (In re Holford)*, 896 F.2d 176 (5th Cir. 1990).

" 'Recoupment allows a defendant to reduce the amount of a plaintiff's claim by asserting a claim against the plaintiff *which arose out of the same transaction* to arrive at a just and proper liability on the plaintiff's claim.' " *Holford*, 896 F.2d at 178 (quoting Collier on Bankruptcy ¶ 553.03 (15th ed.1984)). "[S]etoff involves a claim of the defendant against the plaintiff which arises out of a transaction which is different from that on which the plaintiff's claim is based." *Id.*

Funds collected by TAB on purchased accounts under the Factoring Agreement derive from a transaction separate from All Trac obligations for the purchase of fuel under the Fuel Agreement. Recoupment does not apply. Similarly, funds collected by TAB pursuant to the Factoring Agreement derive from a transaction separate from All Trac obligations for the license fee advance negotiated by a separate agreement outside the ordinary course of the Factoring Agreement. Recoupment does not apply.

## Letters to Customers

On August 15, 2002, TAB sent 538 letters to All Trac's customers. On September 19, 2002, TAB sent another 538 letters to All Trac's customers. All Trac contends that each letter violated the automatic stay

by exercising control over property of the estate and by attempting to collect a pre-petition claim. 11 U.S.C. § 362(a)(3) and (a)(6).

The August 15, 2002, letters stated that All Trac had assigned its present and future accounts to TAB. The letters further instructed that "all amounts owing to [All Trac] must be sent directly to TAB...." The letters warned customers that "TAB still maintains the ownership rights in all amounts owing to [All Trac] and any statements to the contrary by [All Trac] should be disregarded" and that failure to remit payments to TAB may result in civil liabilities.

TAB had no business reason to send the letters to All Trac's customers. Following an agreement with Conklin, on August 14, 2002, All Trac had filed the emergency motion for use of cash collateral and post-petition factoring, requesting that the court allow the parties to continue their relationship consistent with All Trac's normal course of business. On August 15, 2002, at 9:30 a.m., the court held a hearing on the motion and granted relief effective immediately from the bench even though the court did not enter the order until the next day. With All Trac's normal course of business with TAB continuing for at least ten days, TAB had no business reason to communicate with All Trac's customers. All Trac's customers had been informed of the factoring relationship with TAB pre-petition. TAB had no need to again inform them. TAB had no fear that it would not receive account payments. The court protected TAB in the event of customer uncertainty. The order entered August 16, 2002, directed All Trac to immediately pay funds it received attributable to TAB-purchased accounts to TAB. The customers had no fear of "civil liabilities," as they would have either paid TAB or All Trac.

More likely than not, TAB sent the letters as a result of a personal falling out with Frakes. While Conklin, with TAB's outside counsel, and Orenstein had negotiated the interim ten-day agreement, Frakes had been dealing with Harding concerning logistics. All Trac's reserve account balance on August 14, 2002, would not cover post-petition fuel charges as well as other operating expenses. Harding requested that Frakes provide a $5,000 deposit. Frakes agreed to provide $10,000 to cover fuel charges until the court authorized the use of cash collateral and post-petition factoring. Frakes testified that he suggested the larger sum to assure protection, so that All Trac's trucks could remain on the road. Frakes deposited the $10,000 with TAB, using his personal funds. Frakes understood that TAB would release the $10,000 back to Frakes once the court authorized the use of cash collateral and post-petition factoring.

Harding provided wire transfer instructions to Frakes. Frakes caused the funds to be transferred. Through no fault of Frakes, TAB did not deposit the funds in the correct All Trac account. Harding testified that TAB deposited the funds in a control account, rather than in the reserve account, to assure that the funds not be used for any purpose other than fuel.

On August 15, 2002, Frakes learned that TAB had not honored several checks. All Trac had submitted several checks for payment of pre-petition obligations that ordinarily would have been paid on August 14, 2002. TAB did not honor fifteen checks on August 14, 2002. Conklin testified that TAB knew it could not honor those checks, as that would amount to using All Trac's interest in property to pay pre-petition debts. TAB had not yet purchased accounts following the hearing earlier in the day on August 15, 2002. Frakes understood that drivers had difficulty obtaining

fuel credit from TCH. Frakes called Brenda Ellis, a TAB employee, at TAB. Frakes told Ellis that All Trac had to have sufficient funds in its account to cover the checks. He demanded to know what happened to funds in All Trac's reserve account. He asked to speak to Harding, but Harding was not available. He tried to reach Conklin but could not get through to Conklin. Fearing that he was in the process of losing his business, Frakes lost his temper. He cursed Ellis, spewing expletives at her.

Conklin responded angrily. After discussing the incident with Ellis, Conklin decided that TAB's relationship with All Trac should be terminated. As TAB's general counsel, he interpreted Frakes' unprofessional conduct as increasing TAB's risks that All Trac would not perform under the Factoring Agreement. He directed that TAB stop financing All Trac. He may have informed TCH that TAB would terminate its relationship with All Trac. He suggested that TCH discontinue the cash advance function on the fuel cards. But Conklin testified that he did not instruct TCH to stop providing credit for fuel purchases. Frakes understood that Conklin would shut down credit for All Trac. Frakes beseeched TCH to provide fuel credit and cash advances. The lawyers for All Trac and TAB worked on patching this incident during the remainder of the day on August 15, 2002.

■■■ TAB's letters to All Trac's customers must be read in the context of this event. In that context, the letters constitute an act to collect or recover a claim against the debtor and/or to obtain control over property of the bankruptcy estate in violation of § 362(a)(3) and (a)(6). TAB willfully sent the letters to All Trac's customers. Having decided to terminate the relationship, TAB sent the letters to assure payment of accounts to TAB to allow TAB to apply funds to All Trac's prepetition debt. While TAB cannot be compelled to continue to factor, TAB could not unilaterally begin efforts to collect debt when it decided to stop factoring. The court modified the stay to allow collection and application to obligations but only in the context of TAB factoring during the ten-day period. The court did not modify the stay for TAB to communicate with customers to collect debt when TAB elected not to factor. TAB's reaction to Frakes resulted in violations of the automatic stay.

On September 19, 2002, TAB again sent 538 letters to All Trac's customers. All Trac contends that each letter violated the automatic stay. TAB informed All Trac's customers that it owned all of All Trac's accounts. TAB demanded that All Trac's customers direct their payments to TAB, regardless of any notification to the contrary from All Trac. TAB warned customers that remittance to any other entity would subject the customer to multiple liability. TAB told customers to continue to pay TAB unless the customer received a notarized statement to the contrary signed by one of TAB's officers.

As with the August 15, 2002, letter, TAB had no business reason to send the letters to All Trac's customers. More egregious, the letter was false and misleading.

As found above, on September 6, 2002, All Trac filed the Allied motion. The court held an interim hearing on the Allied motion on September 9, 2002. Following the hearing, on September 9, 2002, the court entered an interim order authorizing All Trac to enter a factoring and security agreement with Allied. The court authorized All Trac to sell accounts to Allied upon entry of the order. The court specifically ordered that "[p]ayment for all of [All Trac's] invoices dated August 14, 2002, which were factored by [All Trac] shall be paid directly to [Allied]." Interim Order

Granting Emergency Motion for Authority to Enter Into Factoring Agreement, to Grant Post Petition Lien, and Setting Final Hearing Thereon, entered September 9, 2002, ¶ 3.

All Trac did not factor any accounts with TAB after September 10, 2002. All Trac began selling its accounts to Allied on September 11, 2002. Clay Tramel, Allied's president, testified that All Trac tendered accounts to Allied on September 11, 2002, which Allied purchased on September 12, 2002. After the Allied motion and the September 9, 2002, hearing and order, Conklin knew that All Trac began selling accounts to Allied. The court's order entered on September 9, 2002, had been served on TAB. Thus, TAB knew that the September 19, 2002, letter falsely stated TAB owned all of All Trac's accounts. TAB also knew that the letter's instructions demanding that the customers pay TAB directly contradicted the court's directive that Allied collect payments on invoices dated August 14, 2002, or later.

All Trac, TAB and Allied agreed that Allied would buy out the TAB position. Tramel, Conklin and Frakes all acknowledged that the parties intended that Allied would buy out TAB's position upon final court approval of All Trac's motion to enter a factoring agreement with Allied. The court's order directing payment of All Trac's post-petition accounts to Allied contemplated that buyout.

Conklin's explanation for the letter lacks credibility. Conklin testified that he anticipated that TAB would continue to purchase accounts from All Trac after the September 6, 2002, Allied motion. He wanted to assure that accounts purchased by TAB would be paid to TAB. However, Conklin testified that customarily the new factor would buy out the old factor. Successor factors would not overlap factoring. Furthermore, the court's August 16, 2002,

order authorizing All Trac to sell accounts to TAB had expired by September 9, 2002. All Trac had no authority to sell any subsequent accounts to TAB. TAB knew that. TAB also knew that All Trac had not assumed its pre-petition Factoring Agreement with TAB. Just as Conklin knew that TAB could not cover pre-petition checks drawn to pay pre-petition All Trac debts, Conklin knew that All Trac could not obtain post-petition credit without court authorization.

TAB willfully sent the letters to collect and/or recover pre-petition debts in violation of § 362(a)(6). In doing so, TAB also willfully acted to exercise control over property of the bankruptcy estate in violation of § 362(a)(3).

TAB took this action while simultaneously negotiating with Allied for the buyout of its position. Contrary to his expectations, Tramel testified that the buyout process took about one month to resolve. In negotiations, TAB sought to address an irrevocable standby letter of credit for insurance it had issued. TAB also wanted to recover its attorney's fees, cover fuel and overdraft costs, and obtain a release. Conklin acknowledged that the resulting buyout cost would exceed the maximum amount Allied could collect on the TAB purchased accounts. Tramel testified that the TAB letters to All Trac customers in conjunction with TAB's negotiation posture increased the risks of the transaction to Allied. Allied requested additional fees and security from All Trac. All Trac sought relief from the court to pay Allied an additional 0.5% fee for ninety days and grant Allied a second lien on All Trac's real property for ninety days. Upon motion and hearing, the court granted that relief. In addition, All Trac commenced the instant adversary proceeding and obtained the temporary restraining order described above. Allied eventually

purchased the TAB position on October 24, 2002. TAB has been paid in full.

Viewed in the context of the buyout negotiations, TAB's September 19, 2002, letters to All Trac's customers affected the manner of All Trac's payment of TAB's claim. Thus, the letters constituted direct efforts by TAB to collect its claim from All Trac's customers in violation of the automatic stay and indirect efforts by TAB to collect its claim from Allied's buyout by leveraging the buyout negotiations, again in violation of the automatic stay.

### Control Over Assets

All Trac contends that TAB violated the automatic stay by exercising control over All Trac's assets. All Trac asserts that TAB controlled All Trac's post-petition accounts on August 14, 2002, without funding; controlled All Trac's post-petition accounts on August 15, 2002, without funding; controlled All Trac's post-petition accounts on August 16, 2002, without funding; and, on four occasions, demanded release of claims as a condition to agreeing to requested relief by All Trac.

TAB had agreed to purchase accounts post-petition on August 14, 2002. All Trac thereupon filed its emergency motion to use cash collateral and for the approval of interim post-petition factoring with TAB. At the hearing on the motion on August 15, 2002, the court authorized All Trac to sell accounts to TAB post-petition. The court entered its order on August 16, 2002. Patricia Carr, All Trac's employee who processed invoices and accounts receivable, testified that she forwarded a schedule of accounts to TAB on August 14, 2002. Carr testified that pre-petition, TAB would usually purchase accounts the following day. TAB did not purchase accounts on August 15, nor did TAB report to All Trac regarding its inaction on August 15. TAB purchased the accounts on the August 14 schedule on August 16, 2002.

All Trac did not send a schedule of accounts to TAB on August 15, 2002. All Trac did send a schedule of accounts to TAB on Friday, August 16, 2002. Carr included All Trac invoices for August 15 and August 16 on the August 16 schedule sent to TAB. Under the parties' pre-petition course of conduct, TAB did not purchase accounts over the weekend. TAB purchased accounts on Monday, August 19, 2002. On August 20, 2002, TAB purchased the rest of the accounts offered by All Trac through August 19, 2002.

Carr testified that TAB failed to regularly submit reports to All Trac post-petition. TAB also denied All Trac access to online reports post-petition. Carr also encountered difficulty communicating with TAB personnel post-petition, by telephone and by e-mail. As a result, All Trac could not assess how TAB was handling All Trac's invoices. While All Trac submitted accounts to TAB for purchase, All Trac could not determine if TAB intended to purchase the accounts. All Trac argues that, as a result, TAB exercised control over its assets in violation of the automatic stay.

■ Post-petition, TAB did disrupt its ordinary course of conduct with All Trac, sometimes justifiably, sometimes not. As found above, Conklin responded to Frakes' outburst on August 15, 2002, by moving to terminate the parties' business relationship. That incident caused a disruption virtually through August 16, 2002. On the other hand, Harding's actions regarding the license fee, Conklin's decision to send letters to All Trac's customers, and TAB's preference for TCH pre-petition debt all served TAB's efforts to collect its pre-petition claim post-petition. Nevertheless, simultaneously, TAB agreed to All Trac's use of its cash collateral and agreed to purchase accounts post-petition under the

Factoring Agreement. TAB agreed to two court orders providing for factoring from August 14, 2002, to September 9, 2002. TAB floundered between two rocky shores—on the one hand, attempting to consensually work with All Trac despite conflicts while, on the other hand, attempting to collect its pre-petition claim.

In this context, All Trac has not established that TAB violated the automatic stay in the manner that it handled the purchase of accounts, the business disruptions notwithstanding. TAB purchased the August 14 accounts on August 16. TAB purchased the August 15 and August 16 accounts by August 19, a weekend having intervened. TAB purchased accounts offered through August 19 by August 20.

TAB did request that it be released by All Trac from claims All Trac may have had against TAB. As found above and as will be further addressed below, All Trac did have claims and disputes with TAB regarding several of TAB's post-petition acts. Conklin testified that, as the bankruptcy case evolved, he attempted to negotiate releases as part of either agreed actions or as part of the Allied buyout. Conklin testified that request for releases in negotiations constituted sound and accepted business practices. The court infers, as well, that the request for a release recognized the potential exposure by TAB as it attempted to negotiate the conflicting shores. Conklin requested a release as part of the parties' negotiations over the entry of the second interim order for the use of cash collateral and post-petition factoring, over the extension of fuel charge credits discussed below and over the Allied buyout. All Trac did not agree to the release. The parties never reached a compromise and settlement. All Trac never presented a motion in its bankruptcy case under Bankruptcy Rule 9019 to settle its claims with TAB.

The Bankruptcy Code contemplates that debtors in possession will, as part of the reorganization process, attempt to resolve disputes with creditors. Bankruptcy Rule 9019 presents the procedural mechanism for resolutions to be considered by parties in interest in a bankruptcy court and assessed by the court. The process itself connotes negotiations. Negotiations assume the parties will discuss releases. All Trac has not established that in the context of negotiations TAB exercised control over assets of the bankruptcy estate in violation of the automatic stay.

### Control Over Funds

All Trac contends that TAB violated the automatic stay by exercising control over All Trac's funds. All Trac asserts that TAB controlled All Trac's post-petition funds on several occasions. The court addresses the allegations in the order presented during closing arguments.

■ On August 14, 2002, TAB reversed the payment of All Trac's ACH draft to pay a pre-petition claim of Comdata Corporation, a fuel card provider. The payment of pre-petition debts had been stayed. In this instance, TAB acted consistently with the mandate of § 362. Although All Trac may have preferred that Comdata be paid, All Trac did not request and did not receive court authorization to pay Comdata's pre-petition claim. The decision not to honor the Comdata draft did not violate the automatic stay.

■ On August 16, 2002, TAB transferred Frakes' $10,000 to a control account. Harding testified that TAB transferred the funds to the control account to assure that the funds only be used for post-petition fuel charges. However, by August 16, 2002, the funds were not needed to cover fuel purchases. Frakes deposited the funds with TAB to cover fuel purchases until All Trac obtained court

authorization to use cash collateral and to sell post-petition accounts. When Frakes transferred the funds to All Trac's bank account at TAB, the funds became property of the bankruptcy estate. *Southmark Corp. v. Grosz (In re Southmark Corp.),* 49 F.3d 1111, 1116–17 (5th Cir.1995) (debtor presumptively has a property interest in funds in bank account over which debtor has check-writing authority). On August 15, 2002, the court authorized All Trac to use TAB's cash collateral and to sell accounts to TAB for fuel and other operating costs. The court entered its first interim order on August 16, 2002. On August 16, 2002, TAB should have transferred the funds into All Trac's reserve account for All Trac's use. Instead, TAB transferred the funds to the control account. TAB did not make the funds available to All Trac until August 19, 2002. TAB's transfer of the funds to the control account occurred at the same time as the Frakes–Ellis incident and TAB's reaction to it. Harding's decision to transfer the funds also occurred at the same time that TAB had sent the letters to All Trac's customers. All Trac had an immediate need to use the funds on August 15, 2002, continuing to August 19, 2002, when the funds became available. TAB knew that All Trac needed access to the funds, either through All Trac's reserve account or through a transfer back to Frakes. Without a business reason, TAB exercised control over the funds. Consequently, the court finds that TAB violated the automatic stay by exercising control over these funds.

■ All Trac complains that TAB exercised control over funds by discontinuing All Trac's access to TAB's online banking system. While TAB's action reflects its conflicting approach to the case, the action does not constitute a violation of the automatic stay.

■ All Trac also contends that TAB withheld access to $12,045.45 on August 19, 2002, after the dishonored checks of August 14, 2002, had been reprocessed and cleared. TAB separated $12,045.45 from All Trac's demand account into an escrow account. TAB held the funds in escrow to cover the dishonored checks when presented again. TAB did not inform All Trac that the funds would be held in escrow. Sharron White, All Trac's office manager, testified that All Trac had sufficient funds to cover the checks, and, therefore, should have had access to the escrowed funds. TAB should not have transferred property of the bankruptcy estate into an escrow account without All Trac's consent. Nevertheless, All Trac has not established that TAB did not apply the funds to clear the checks.

From September 11, 2002, All Trac contends that TAB refused to disburse funds from All Trac's reserve account for use by All Trac. All Trac contends that TAB made the following disbursements from the reserve account to itself: $7,507.09 on September 16, 2002; $5,153.09 on October 31, 2002; $9,022.47 on October 31, 2002; $2,679.39 on November 6, 2002; $1,990.00 on November 7, 2002; $2,768.08 on November 18, 2002; and $9,816.36 on May 29, 2003. All Trac asserts that each of these payments amounts to the exercise of control over All Trac's funds in violation of the automatic stay. TAB responds that none of these acts constituted a violation of the automatic stay.

TAB did not transfer funds from All Trac's reserve account to its demand account after September 11, 2002, except for September 12, 2002, and September 16, 2002. TAB dishonored All Trac checks from about September 13, 2002, through the end of September 2002. However, All Trac's demand account had sufficient funds to pay those checks.

The modification of the automatic stay to allow TAB to purchase accounts, receive collections on purchased accounts and apply those collections "in the ordinary course of business" to outstanding obligations ended with the expiration of the term of the court's second interim order entered August 26, 2002. The order applied until September 7, 2002, although the parties agreed to extend the term to September 9, 2002. By order entered September 9, 2002, the court authorized All Trac to sell accounts to Allied. The court directed that all factored invoices dated after August 14, 2002, should be paid to Allied. The court extended that order by subsequent orders, described above.

Thus, after September 11, 2002, TAB should not have been collecting All Trac receivables. Any funds collected by TAB after that date that TAB did not transfer into All Trac's demand account or transfer to Allied would constitute property of the bankruptcy estate over which TAB was exercising control without court authorization and hence in violation of the automatic stay. Any application of these funds to cover pre- or post-petition obligations of All Trac to TAB without a court order would violate the automatic stay. And refusing to apply those funds to cover checks for post-petition obligations in September 2002 would violate the automatic stay.

As TAB continued to collect accounts and hold funds, All Trac filed the instant litigation. In the agreed order entered October 1, 2002, regarding application for temporary restraining order, TAB agreed that Allied would be the sole party to collect all of All Trac's accounts, whether pre- or post-petition. The parties agreed that TAB had no interest in accounts, and that Allied owned or had a security interest in accounts, from and after September 11, 2002. The parties also agreed that

Allied had no interest in accounts, and that TAB owned or had a security interest in accounts, before September 11, 2002. The court ordered that "Allied shall immediately purchase outstanding and unpaid TAB accounts," provided that the court also granted Allied specific adequate protection in the underlying bankruptcy case. But the court recognized that residual TAB accounts might exist. Consequently, the court provided that if Allied had not purchased a TAB account or the customer had not paid the account within ninety days, All Trac would repurchase the account from TAB. If Allied collected a TAB account not yet purchased from TAB, Allied would transfer the payment to TAB.

On October 1, 2002, the court entered an order directing that All Trac's customers make their payments to Allied.

Thus, the court must determine whether it modified the stay after September 7, 2002, to permit TAB to retain the funds without making them available to All Trac either directly or through Allied or to permit TAB to apply any of the funds to All Trac's obligations to TAB. Conklin testified that after All Trac filed its motion to factor with Allied on September 6, 2002, TAB did not file a motion with the court to modify the stay or for adequate protection. Conklin testified that TAB did not seek that relief because TAB figured its position would be bought out by Allied. Under the Factoring Agreement, TAB could hold funds in the reserve account for ninety days following termination of the agreement to assure clearance of all accounts. Conklin testified that All Trac's invoices typically provided for payment in net thirty days, with TAB receipt of payment typically occurring forty-five to sixty days after purchase of the account. TAB therefore expected a carryover of several accounts after Allied's buyout. Pursuant to the Factoring Agreement, TAB held

funds in the reserve account for that contingency. But the court did not authorize All Trac to assume the Factoring Agreement and All Trac did not assume the agreement.

Therefore, any stay modification to allow TAB to hold funds in which All Trac had an interest must derive from the October 1, 2002, order regarding application for temporary restraining order. TAB should not have collected any funds after entry of the September 9, 2002, order. The October 1, 2002, order divided TAB interest in accounts from Allied interest in accounts as of September 11, 2002. The October 1, 2002, order contemplated an expeditious Allied buyout of TAB ("immediately" after Allied received an adequate protection order). But, pending the buyout, the order further contemplated that Allied would collect funds that would be transferred to and held by TAB and that some TAB purchased accounts may not get resolved by the buyout. Thus, funds collected by Allied attributable to TAB accounts not yet purchased by Allied were to be delivered to and held by TAB. The order implicitly modified the stay to permit TAB to hold those funds. The order compelled Allied's buyout of TAB upon the granting to Allied of adequate protection. The order did not direct how the buyout should occur or how it should be implemented by the parties. Thus, fairly read, the order authorized application of funds by TAB as part of the buyout process.

If TAB collected any funds from postpetition invoices after September 9, 2002, the funds should have been transferred to Allied. If the Allied collection occurred before the buyout, Allied would have transferred the funds to TAB. If TAB incorrectly collected the funds but held the funds in the reserve account, the funds would be held as contemplated by the October 1, 2002, order. If TAB applied the

funds from the reserve account in any manner other than by payment to Allied or to All Trac's demand account except as partial payment pursuant to the buyout, TAB would have violated the automatic stay.

The order required that Allied collect all funds. If TAB incorrectly collected funds after the buyout on accounts not included in the buyout, TAB had no authority to hold the funds. The October 1, 2002, order directed an end to All Trac's banking relationship with TAB. If any TAB retained accounts were not paid after ninety days from the date of the order, the order required All Trac to repurchase the accounts from TAB "for an amount equal to the full face amount of such accounts." Agreed order, October 1, 2002, ¶ 3. The order did not modify the stay, expressly or implicitly, to allow TAB to apply the funds to the purchase price of the account or make any other use of the funds. After the buyout, TAB should not have held funds in which All Trac had an interest.

▇▇▇ Allied purchased accounts from TAB on October 24, 2002. Allied paid TAB $94,903.79. The parties executed an assignment of accounts. After the payment, TAB held $5,153.09 in All Trac's reserve account. TAB applied those funds on October 31, 2002, to close out the All Trac account. By doing so, TAB included the funds in the buyout calculation. Application of the funds did not violate the automatic stay.

▇▇▇ With regard to the transfer of $7,507.09 on September 16, 2002, TAB transferred those funds from All Trac's reserve account to its demand account on September 16, 2002. TAB has a form reporting that Frakes requested that transfer. TAB did not clear All Trac checks to third persons after September 16, 2002, but, at month's end, TAB applied the balance of the demand account to All

Trac's pre-petition line of credit with TAB. This violates the automatic stay.

■■■ Thereafter, All Trac has established that TAB collected additional funds. However, TAB should not have been collecting or holding funds from non-factored accounts. After the application of the $5,153.09 on October 31, 2002, to complete payment of the October 24, 2002, buyout, all of All Trac's factored accounts should have been purchased by Allied or, if not, should have been covered by the ninety day buyback at face amount provision of the October 1, 2002, order. TAB did not assign all factored accounts to Allied. The record reflects that TAB did not assign accounts totaling $29,950.03. TAB collected on those accounts. The court order directed Allied to collect all accounts. TAB's use of the following funds therefore amounts to exercising control over funds of the bankruptcy estate in violation of the automatic stay: $9,022.47 on October 31, 2002; $2,679.39 on November 6, 2002; $2,768.08 on November 18, 2002; and $9,816.36 on May 29, 2003. All Trac contends that TAB retained $1,990 on November 7, 2002. However, the records reflect that TAB tendered that sum to Allied, but Allied returned that amount to TAB. The court, therefore, cannot conclude that those funds did not belong to TAB. With regard to the $9,816.36, on May 29, 2003, TAB made a miscellaneous entry in its statements suggesting that TAB owed that amount to All Trac. White asked Ellis for an explanation, but never received one. TAB did not pay those funds to All Trac.

TAB knew that the August 26, 2002, order expired September 7, 2002, with TAB agreeing to extend its effect to September 9, 2002. TAB knew of the September 9, 2002, hearing on the Allied motion and did not object to the relief requested by All Trac. TAB knew the provisions of the September 9, 2002, order and did not

seek relief from or a modification of that order. TAB agreed to the terms of the October 1, 2002, order. Therefore, the court finds that TAB willfully violated the automatic stay in the several instances after September 11, 2002, of collecting funds not applied to the buyout or disbursed to Allied or All Trac.

All Trac separately asserts that TAB held $54,211.06 of non-factored funds from August 13, 2002, to January 15, 2003, that should have been available for All Trac's use. All Trac further argues that TAB charged back $14,857.96 of accounts from August 13, 2002, to January 15, 2003, without waiting the ninety-day period under the Factoring Agreement. All Trac maintains that on forty-three occasions TAB charged back the entire face amount of invoices when it only advanced 85% of the face amount. Finally, in this category of stay violations, All Trac contends that TAB controlled $14,324.90 of funds received from Allied from September 11, 2002, to January 15, 2003.

TAB's collection of funds have been addressed by the findings above.

With regard to non-factored accounts, prior to September 9, 2002, All Trac could use the cash collateral in accordance with the budgets adopted pursuant to court orders. After September 9, 2002, TAB should not have collected any non-factored accounts. After October 24, 2002, TAB had no right to hold any non-factored funds, the buyout having closed. Collection of non-factored accounts without making the funds available for All Trac's use by transfer to Allied or by transfer to the demand account would violate the automatic stay.

With regard to chargebacks, All Trac should have only been charged with the advanced amount, not the entire face amount. Furthermore, even though the

Factoring Agreement had not been assumed, the court's orders authorizing the post-petition purchase of accounts by TAB provided that the sales should occur under the same terms as set forth in the Factoring Agreement. TAB should not have charged back accounts before the expiration of the ninety days.

With regard to funds received from Allied after the October 24, 2002, buyout and the application of the funds on October 31, 2002, funds received by TAB from Allied should have been available for All Trac's use. TAB has not established that it received those funds on accounts purchased from All Trac but not assigned to Allied.

### Fuel Card Issues

All Trac contends that TAB violated the automatic stay by exercising control over its business. All Trac asserts that TAB controlled its business by manipulating and denying access to and use of the fuel cards.

As found above, All Trac's drivers used TCH fuel cards for the purchase of fuel and for cash advances for road repairs and miscellaneous expenses. All Trac argues that TAB unilaterally imposed daily limits on the use of the fuel cards and arbitrarily and periodically cut off individual driver's access to the fuel cards.

Pre-petition, All Trac had access to the fuel cards through a $40,000 line of credit. Frakes testified that All Trac did not have a daily limit. Rather, All Trac could not exceed total outstanding fuel charges of $40,000. White testified that pre-petition, All Trac set a daily limit of 250 gallons or a fixed dollar amount, she could not recall which, per driver. All Trac limited a driver's cash advance to $100 per week. TCH issued a daily report of card use. All Trac would pay for the credit by a notice of a draw on its demand account at TAB four days later, with the draft paid the following day at midnight. TCH did not suspend card access pre-petition. White testified that neither TAB nor TCH complained about the use of the fuel cards pre-petition.

All Trac did not move the court to assume the Fuel Agreement and the court did not authorize the assumption of the Fuel Agreement. Instead, All Trac and TAB negotiated an agreed budget for the use of cash collateral and for the purchase of accounts by TAB. The budget submitted with All Trac's emergency motion for use of cash collateral and to approve interim factoring filed on August 14, 2002, provided $40,000 for fuel for ten days. Conklin testified that he figured All Trac would average $4,000 a day under that budget. Conklin also testified that a $4,000 per day average would be consistent with All Trac's pre-petition fuel charges of $3,700 to $3,800 per day. The court's order entered August 16, 2002, allowed for a 5% deviation for a budget item. Conklin testified that All Trac never suggested that it needed an additional amount for fuel card use during the ten-day period covered by the order entered August 16, 2002. Frakes testified that he did not know that TAB imposed a $4,000 daily limit. However, the budget set $40,000 for ten days. All Trac's counsel informed the court at a hearing on August 16, 2002, that All Trac estimated using $4,000 per day.

The court's order entered August 26, 2002, covered the two-week period from August 24, 2002, through September 7, 2002. The budget adopted under that order specifically provided for $4,500 per day for fuel charges. For the two weeks covered by that budget, All Trac used less than the $4,500 per day except for the last day, when All Trac used $5,000 of fuel and related charges. Conklin agreed to increase the daily limit to $5,000 when requested by All Trac's counsel.

Frakes testified that, as of August 27, 2002, to assure compliance with the budget, he and Richard Gonzales, All Trac's fleet manager, limited driver access to $4,000 per day on the fuel cards. Frakes and Gonzales set the amount based on the first $40,000 budget. On August 29, 2002, they changed the drivers' limit from a daily dollar limit to 150 gallons of fuel per day.

■■■ The parties acted consistently with the court's orders. While All Trac may have desired less restrictive use of the fuel cards, All Trac did not assume the Fuel Agreement and the court imposed budget limitations pursuant to the parties' agreements regarding the use of cash collateral and post-petition factoring. All Trac never requested relief from those orders. Rather, All Trac acted consistently with those orders. TAB did not violate the automatic stay by imposing daily fuel charge limits on All Trac.

■■■ Nevertheless, All Trac contends that TAB exercised control over its business by controlling the actual use of the fuel cards by All Trac's drivers. Following the filing of the bankruptcy petition, Frakes testified that his drivers had sporadic problems with the use of the fuel cards. On August 15, 2002, and August 16, 2002, he understood that some drivers could not obtain cash advances or purchase fuel with their fuel cards, while another driver could purchase fuel but not obtain cash advances while another could obtain cash but not purchase fuel. Despite telephone calls between counsel for All Trac and TAB, the problems persisted. Frakes' frustration caused All Trac's counsel to obtain a late night emergency hearing to address a fuel card access problem. Frakes understood that his drivers continued to have intermittent problems during the next several days. By August 27, 2002, All Trac had imposed its limitations

on its drivers, as found above, to attempt to regulate the use of the fuel cards. Although Frakes testified that he understood that his drivers had intermittent problems with the fuel cards, he did not know if access to the fuel cards had ever been cut off by TCH. Frakes recognized that TAB provided fuel access daily. Frakes acknowledged that prior to August 24, 2002, All Trac exceeded the $4,000 daily limit only once, and then by only a dollar.

Gonzales testified that he handled several calls from drivers, even during the night, concerning road problems and inability to use the fuel cards to address the problems. While he handled on average one or two emergency calls from drivers per day pre-petition, he did not know of any pre-petition fuel card use problems. Post-petition, All Trac had to adjust to the daily limit on the fuel cards. Gonzales, like Frakes, understood that the drivers had periodic difficulties accessing use of the fuel cards. The drivers would report the problems to Gonzales, who, in turn, would call TCH to address the problem. Gonzales perceived that drivers had difficulty making timely deliveries because of the sporadic problems with the fuel cards. He described scenarios where drivers had to wait until midnight because All Trac had exhausted its daily limit. White testified that she encountered drivers with fuel card problems. On one occasion, she went to a station for fuel for her vehicle. When she went to pay, three All Trac drivers confronted her, demonstrating their inability to use their fuel cards. In August 2002, she recalled talking to a TCH supervisor to have a fuel card activated. White could not recall if access to the cards had been interrupted for 24 or 48 hour periods, but she could recall intermittent problems.

Gonzales testified that he called TCH daily with fuel card problems. Drivers would reach a daily limit. Gonzales testi-

fied TCH never agreed to extend the credit. Rather, the driver would have to wait until midnight, the next day, when a new daily quota would begin. But TAB did not set a daily limit for each driver. On August 29, 2002, All Trac set a daily gallon limit for each driver. TAB, under the budget, fixed a total daily amount for All Trac, which, as found above, All Trac rarely exceeded.

Gonzales discussed difficulties that he understood David Walker, Bruce Wanzer, Bobby Cooper, James Brown, Harry and Ruth Churchman, Mike Jones, Shawn Tubbs, Gary Jones and James King had with the fuel cards. He testified that he or Jennifer Jones at All Trac took calls from drivers all day. He estimated that early in the bankruptcy case he spent about half his time negotiating fuel card problems with the drivers and TCH. Yet, like Frakes, Gonzales acknowledged that All Trac used the fuel cards daily. Gonzales did not know of any time when TAB or TCH cut off all access to fuel cards. He also acknowledged that an analysis of the drivers' time logs do not reveal documented problems by the drivers with the fuel cards. Also, at times, Gonzales turned off access to the fuel cards to force a driver to call headquarters.

The testimony of several drivers revealed that while drivers had some delays and some difficulties accessing the fuel cards at sporadic times, All Trac could not establish problems with the fuel cards that prevented the drivers from substantially performing their daily runs. All Trac can attribute its evidentiary proof problems, in part, to its drivers. Several of the drivers testified that they did not accurately record events in their logs. With a wink and a nod to the regulatory requirements of the United States Department of Transportation, the drivers cut corners in reporting driving activity. Gonzales testified

that the logs reveal an unarticulated code. Drivers should be "on duty" when fueling. If the driver had a fuel problem, the problem did not necessarily have to be described on the log. Rather, the driver had to remain logged on duty. But, rather than follow that procedure, many drivers would flag the problem by recording "off duty" on their logs. Gonzales testified that All Trac instructed the drivers to log off duty when they encountered a fuel card problem. That would interrupt the running of the regulated per day driving time of a driver. With the resolution of the problem, the driver would log back on duty and record fifteen minutes for fueling. Gonzales testified that the logs reveal a fuel card use problem when the logs record "off duty" followed by fifteen minutes for fueling.

Bruce Wanzer, for example, testified about sporadic problems with the fuel cards. He testified that his driver's logs do describe the fuel problems. Wanzer would go off duty for thirty minutes when he encountered a fuel card problem, followed by fifteen minutes on duty for fueling. Other drivers offered similar testimony. Manipulation of federal regulations diminishes the weight accorded the drivers' testimony and thereby hampers All Trac's ability to present specific evidence of fuel card difficulties, as contrasted with evidence of perceived difficulties because of the altered method of doing business caused by the court-approved budget.

Turning to the testimony of other drivers, Al Coleman testified that he had several problems with the use of his fuel card post-petition, but that merely required that he carefully plan his days. He also testified that by late August 2002, he had to work with the daily gallon limit imposed by Frakes. He did not leave All Trac's employment because of delivery problems caused by fuel card access.

Harry Churchman similarly testified about problems using the card, although he attributed his difficulties to the daily gallon limit. Frakes imposed that limit on August 29, 2002. Churchman testified that on occasion he had to wait until midnight to use his card. But he acknowledged that he did not make a late delivery or miss a pickup because of fuel card access problems. His wife, Ruth Churchman, testified that at times they used their own cash for fuel. All Trac would reimburse them.

James King testified that fuel card access problems caused late deliveries. However, he did not drive on August 15, 17, 18, 19 or 20, 2002. He only drove within 100 miles of All Trac's headquarters on August 16 and August 21, 2002. He may have had problems beginning August 24, 2002, but he could not specify his problems. He did purchase sufficient fuel on August 25, 2002, for his needs that day. Frakes rescheduled the delivery as a precaution. King could have driven longer to make the delivery.

Bobby Cooper also discussed problems but could not recall specifics. Cooper experienced disruptions; but those problems did not translate into late deliveries, and he could purchase fuel and obtain cash advances.

Robert Harris described purchasing fuel post-petition as catch as catch can. He testified that fuel would often not be available. At some times, his TCH fuel card did not work. Accessing cash for scale costs, minor repairs and meals became random post-petition. He described an instance when his TCH card did not work for twenty-four hours. He used access checks from another entity and, at times, used his personal credit card. He called Gonzales, and also Frakes, with his problems. When he suffered a five-hour delivery delay, he concluded that he could no longer work for All Trac. He tendered his resignation. From his logs, it appears that he left All Trac effective August 19, 2002, that is, six days into the bankruptcy case and four days after the Frakes incident with Ellis. He basically did not drive between August 19 and August 25, 2002, when he returned his truck to All Trac. Harris conceded that he did not leave All Trac only because of the delivery delay caused by the fuel card problem. He anticipated a pay raise on August 1, 2002. All Trac did not deliver. Harris testified that he would have eventually left All Trac if he did not receive the raise.

Gonzales recognized the difficulty with reconciling the perceived difficulties with the use of the fuel cards and TAB's records of per day available fuel card credit. Assuming the accuracy of TAB's records, Gonzales testified that, had he known, he would have authorized additional fueling by individual drivers or had other trucks fueled. Gonzales stated that he would have authorized the use of additional fuel if he had known that credit remained on a given day.

As found above, on August 15, 2002, Conklin told All Trac that TAB would discontinue its relationship with All Trac. Conklin informed TCH that TAB had terminated its factoring relationship with All Trac. Conklin said that TAB would stop financing All Trac under the court's interim order. Conklin directed that the cash access function be removed from the fuel card. However, Conklin said that he did not want to disrupt operations by shutting off access to the fuel cards for the purchase of fuel, as that would harm both All Trac and TAB. Conklin testified that he never directed TCH to discontinue All Trac access to fuel cards for the purchase of fuel.

On August 16, 2002, Conklin learned from All Trac's counsel of the fuel card

problems. Yet, Conklin testified that All Trac's counsel did not inform him of specific stranded drivers unable to purchase fuel using the TCH fuel card.

This evidence paints a murky picture. TCH fuel card access changed post-petition. The court-approved post-petition budgets placed limits on the use of cash collateral and factored funds for the purchase of fuel. Those limits did not exist in that fashion pre-petition. Post-petition, TAB regulated access to the fuel cards on a daily basis consistent with those budgets. TAB made fuel purchases available daily consistent with that daily allocation. But those limits may have caused drivers periodic problems and disruption in their pre-petition practices.

During the ten days covered by the order entered August 16, 2002, All Trac only exceeded the daily limit once, and then by one dollar. All Trac did not request an increase in the daily limit during that initial ten days. The budget for the next two weeks increased the daily limit. And, thereafter, TAB agreed to a further increase. All Trac actually imposed limits on its drivers in late August 2002 to regulate and control fuel card use consistent with the budget. There is no evidence that All Trac had been denied fuel credit on any single day.

Yet, from All Trac's perspective, All Trac encountered intermittent problems with the use of the fuel cards that did not exist pre-petition. Frakes, Gonzales and White all perceived that All Trac's drivers encountered periodic problems, which they reported to TCH. While not entitled to substantial weight, several drivers did experience periodic problems with the use of the cards, which they reported to Frakes and/or Gonzales. All Trac encountered problems with the use of the fuel cards that it had not experienced pre-petition.

The Frakes–Ellis incident resulted in a substantial disruption in ordinary business practices on August 15 and August 16, 2002, just two or three days into the bankruptcy case. While TAB may not have intended to terminate use of the fuel cards, its message to TCH would have likely caused a disruption in services. TAB told TCH that it had stopped financing All Trac and that TCH should not allow the fuel cards to be used for access to cash. While All Trac and TAB resumed their business relationship, as late as 10:00 p.m. on August 16, 2002, All Trac sought court intervention. A disruption of that magnitude would have reverberated for a period of time. The court infers that ordinary course of business operations between TCH and All Trac may have been disrupted as a result of these events for several days.

On August 27, 2002, All Trac itself imposed a per day dollar limit on the purchase of fuel. On August 29, 2002, All Trac placed a per day limit on the gallons of fuel a driver could purchase.

On this record, All Trac has not established by clear and convincing evidence for a contempt of court that TAB controlled All Trac's business by manipulating and denying access to and use of the fuel cards. Business disruptions caused by Chapter 11–driven budgets, a human reaction to an unfortunate professional meltdown by the debtor, and other events cannot be elevated to contempt of court for violations of the automatic stay.

### Other Business Control

 All Trac also complains that TAB exercised control over All Trac's business in violation of the automatic stay by unilaterally determining post-petition creditors to be paid and by denying All Trac access to online factoring information. As found above, on several occasions, All Trac did not honor certain All Trac checks,

yet paid itself and TCH for pre- and post-petition obligations. As found above, TAB acted consistently with the dictates of the automatic stay by not honoring All Trac drafts to pay pre-petition obligations, absent court order, on August 14, 2002, but then violated the automatic stay by paying itself for the pre-petition license plate obligation.

In mid-September 2002, TAB began dishonoring All Trac checks. Beginning on September 13, 2002, with one exception, TAB did not allow transfers to All Trac's demand account. TAB asserted that All Trac did not have sufficient funds available to honor checks being presented in September. On September 18 and 27, 2002, TAB returned several checks unpaid, even though TAB had sufficient funds to cover the checks. In September, TAB held funds anticipating the Allied buyout. The buyout would have compensated TAB. To the extent the checks covered post-petition All Trac obligations, TAB should have honored the checks in September. TAB violated the automatic stay by exercising control over these funds in anticipation of payment of its claim against All Trac.

After the filing of the bankruptcy petition, TAB denied All Trac access to online factoring information that had been provided pre-petition. TAB did not provide a business reason for that action. The action appears vindictive yet self-defeating. TAB agreed to purchase post-petition accounts from August 14, 2002, to September 9, 2002. All Trac continued to use TAB's banking facilities during that period. During that time, TAB and TCH held pre-petition claims against All Trac. Disruption of the flow of information between TAB and All Trac could only hamper this ongoing business relationship. Yet, disrupting access to online information does not amount to a violation of the automatic stay.

### Pre-petition Invoices

■ All Trac contends that, from August 13, 2002, to January 15, 2003, TAB charged back seventy-one purchased accounts totaling $29,338.97. TAB applied post-petition funds to pay the chargebacks. Pre-petition invoices purchased by TAB belonged to TAB. TAB owed All Trac the remainder of the purchase price for the accounts. Under the Factoring Agreement, TAB could sell or charge back an account to All Trac if TAB had not fully collected the account within ninety days. All Trac did not assume the Factoring Agreement. Thus, TAB may have had a pre-petition right to sell back uncollected accounts. That right amounts to a claim under the Bankruptcy Code. 11 U.S.C. § 101(5). Absent a court order granting relief from the automatic stay, TAB could not pay itself for a pre-petition obligation.

For pre-petition accounts, the court did not grant relief from the automatic stay. As a result, if TAB charged back any pre-petition accounts, it would have violated the automatic stay. 11 U.S.C. § 362(a)(3), (a)(6) and (a)(7). For post-petition accounts purchased between August 14, 2002, and September 7, 2002, the court granted relief from the automatic stay to apply collections to obligations under the Factoring Agreement. While the parties agreed to continue factoring with TAB to September 9, 2002, the court did not enter an order further modifying the stay. TAB did not purchase accounts after September 9, 2002. The October 1, 2002, order addressed a final chargeback of accounts not assigned to Allied. On this record, any chargebacks, except those between August 14, 2002, and September 7, 2002, and final chargebacks for accounts not assigned to Allied, would violate the stay.

However, TAB objects to the court's consideration of this issue, as the issue was not identified as a contested fact in the

pre-trial order. The court sustains the objection, and gives the issue no further consideration.

From August 13, 2002, to October 25, 2002, All Trac contends that TAB sold back four pre-petition accounts totaling $3,775.00 for which it advanced no funds to All Trac. TAB applied post-petition funds to pay those chargebacks. If TAB did not advance funds, then TAB never actually purchased the accounts. At most, under the Factoring Agreement, TAB would have a security interest in the accounts. But the accounts would be property of the bankruptcy estate. TAB would have exercised control over property of the bankruptcy estate. TAB would have used post-petition property of the bankruptcy estate to implement the chargeback.

TAB responds that All Trac first raised this issue in closing arguments. Chargeback of accounts for which there were no advances is not an identified contested fact in the pre-trial order and, therefore, not further considered by the court.

**Interim Order Entered August 16, 2002**

As found above, on August 16, 2002, the court entered its first interim order which authorized All Trac to use TAB's cash collateral and factor invoices for ten days. All Trac contends that TAB violated that order by disrupting fuel card use and failing to fund the purchase of invoices. TAB agreed to purchase invoices. The court authorized All Trac to sell invoices to TAB "under the same terms and conditions as set forth in the Factoring Agreement and the Fuel Agreement."

All Trac contends that TAB violated the order by failing to fund the purchase of accounts from August 15, 2002, to August 19, 2002. As found above, All Trac did not send a schedule of accounts to TAB on August 15, 2002. All Trac did send a schedule of accounts to TAB on Friday, August 16, 2002. All Trac included in-

voices for August 15 and August 16 on the August 16 schedule sent to TAB. Under the parties' pre-petition course of conduct, TAB did not purchase accounts over the weekend. TAB purchased accounts on Monday, August 19, 2002. On August 20, 2002, TAB purchased the rest of the accounts offered by All Trac through August 19, 2002. All Trac has not established that this conduct violated the court's order entered August 16, 2002.

All Trac further contends that from August 15, 2002, to August 23, 2002, TAB disrupted All Trac's use of the TCH fuel cards in violation of the order. The court authorized All Trac to use TAB's cash collateral for budgeted expenses, including $40,000 for fuel for ten days. The order does not authorize All Trac to assume the Fuel Agreement, but TAB conditioned its consent to the use of cash collateral and to factor accounts on the parties performing "substantially under the same terms and conditions as existed prior to the Petition Date." The court order therefore contemplated the continued use of the TCH fuel cards.

TCH reported fuel card charges by All Trac for each of the days cited by All Trac, as follows: August 15, 2002, $3,225.95; August 16, 2002, $3,982.10; August 17, 2002, $4,001.54; August 18, 2002, $3,498.79; August 19, 2002, $2,685.48; August 20, 2002, $3,961.88; August 21, 2002, $3,756.86; August 22, 2002, $2,968.52 and August 23, 2002, $3,986.04. This daily use includes cash advances. As found above, on August 15, 2002, continuing into August 16, 2002, TAB suspended its business relationship with All Trac following the Frakes–Ellis incident. While TAB did not direct TCH to disconnect fuel card access for the purchase of fuel following the Frakes–Ellis incident, All Trac experienced disruption in services. As further found above, that disruption continued with All Trac facing

intermittent problems by drivers using fuel cards. Yet, TCH provided fuel daily. While All Trac established disruption in services with continuing intermittent problems, All Trac has not established that TAB violated the order entered August 16, 2002, regarding the use of the fuel cards. The order authorized use of cash collateral to purchase fuel, contemplating the parties would perform substantially as they had pre-petition, but subject to a budget and without the assumption of the Fuel Agreement. In doing so, the court did not decree that the parties would perform without disputes as if in a vacuum sealed from human reaction to confrontational situations.

### Judge McGuire Orders

■ All Trac's frustrations with the operations of the fuel cards resulted in two emergency hearings on August 16, 2002— one at approximately 5:00 p.m., and the other at approximately 10:45 p.m. The court rendered two oral rulings requiring that TAB comply with the order entered August 16, 2002. All Trac argues that TAB did not comply with those directives. However, as found above, TAB purchased tendered invoices by August 19, 2002, a Monday, and August 20, 2002. TCH provided fuel each day. As described above, TAB had a conflicted approach to All Trac's bankruptcy. On the one hand, TAB agreed to provide financing post-petition to keep All Trac operating. On the other hand, TAB pursued collection and protection of its interests, at times in violation of the automatic stay, all against the background of an unanticipated bankruptcy petition and the Frakes–Ellis incident of August 15, 2002. Frayed business relationships and nerves do not translate into contemptuous violations of court orders. Again, the court must reiterate, All Trac has established a disruption in services with a resulting frustration by All Trac, but that does not establish the violation of a court order.

### Interim Order Entered August 26, 2002

As found above, on August 26, 2002, the court entered a second interim order which authorized All Trac to use TAB's cash collateral and factor invoices for two weeks. All Trac contends that TAB violated that order by disrupting fuel card use and by unilaterally imposing a daily limit on the fuel cards. TAB again agreed to purchase invoices. The court authorized All Trac to sell invoices to TAB "under the same terms and conditions as set forth in the Factoring Agreement and the Fuel Agreement." But the court subjected All Trac's use of TAB's cash collateral to a two-week budget that included a daily limit of fuel charges of $4,500. All Trac did not object to that budget. All Trac did not request that the court set a different fuel charge amount or provide differently. TAB did not unilaterally impose that limit.

The above findings regarding the continuing perceived intermittent problems with the use of the fuel cards applies to this issue. Despite those problems, TCH provided fuel card access each day covered by the August 26, 2002, order as follows: August 24, 2002, $4,001.37; August 25, 2002, $4,000.92; August 26, 2002, $4,001.88; August 27, 2002, $3,200.88; August 28, 2002, $3,967.40; August 29, 2002, $3,970.25; August 30, 2002, $4,616.41; August 31, 2002, $3,213.80; September 1, 2002, $2,302.30; September 2, 2002, $2,391.82; September 3, 2002, $2,384.85; September 4, 2002, $4,449.08; September 5, 2002, $3,562.90; September 6, 2002, $3,588.30; September 7, 2002, $5,000.97; September 8, 2002, $2,755.40; and September 9, 2002, $3,776.34. All Trac used these funds for the purchase of fuel and for cash advances for its drivers. The order terminated September 7, 2002, although the

parties agreed to continue as if the order ended September 9, 2002. All Trac has not established that TAB violated the court's order entered August 26, 2002.

### Interim Allied Order

■■■ As found above, the court entered an order on September 9, 2002, authorizing All Trac to sell accounts to Allied until October 4, 2002, and providing Allied with a first priority lien on pre- and post-petition accounts and other All Trac assets. The court ordered that "payment of all of [All Trac's] invoices dated August 14, 2002, which were factored by the debtor shall be paid directly to [Allied]." The court entered this order after notice and hearing. TAB appeared at the hearing. TAB did not oppose the relief requested by All Trac. TAB anticipated that Allied would buy out the TAB position, paying TAB in full.

Nevertheless, TAB continued to collect invoices dated on and after August 14, 2002, which had been factored. TAB retained the funds collected. TAB knew that the court directed that payments "shall be paid directly to [Allied]." When TAB received payments from All Trac's customers on these accounts, TAB did not forward the payments to Allied.

On or about September 18, 2002, TAB asserted a first lien on accounts purchased by Allied. That assertion directly conflicted with the court's order granting a first lien to Allied. TAB did not seek relief from the court's order.

Furthermore, as found above, despite the court's order, on September 19, 2002, TAB wrote to All Trac's customers asserting ownership of the accounts and directing the customers to pay TAB directly. TAB warned the customers that failure to pay TAB directly could result in multiple liability. TAB told the customers to remit payments solely to TAB unless the customers received notarized notification to the contrary from TAB. TAB's collection efforts conflicted with the court's order mandating payment to Allied.

TAB knew the provisions of the court's order. TAB did not seek relief from the court's order. TAB acted deliberately and knowingly. TAB had no justification to act directly contrary to the court's directive.

The parties contemplated that within a few days of the entry of a final order by the court approving the Allied factoring agreement, Allied would buy out TAB's position. The court's order allowed All Trac to begin factoring with Allied while furthering the buyout strategy by directing Allied to collect accounts and granting Allied a preferred security position in collateral. Nevertheless, when TAB's negotiations with Allied did not produce agreements on terms TAB requested, TAB acted in disregard of the court's order.

The court holds TAB in contempt of court for violating the order entered September 9, 2002.

### Temporary Restraining Order

The problems caused by TAB's actions after September 9, 2002, and Allied's reaction to them resulted in the instant adversary proceeding. All Trac requested a temporary restraining order. All Trac, Allied and TAB agreed to the entry of an order regarding the request for a temporary restraining order. As found above, the order, entered October 1, 2002, adopted several stipulations by All Trac, TAB and Allied. TAB agreed that it had no interest in any All Trac receivable from and after September 11, 2002, and further agreed that Allied would be the sole owner or hold a first lien on those receivables. Allied agreed, in turn, that it had no interest in any All Trac receivable before September 11, 2002, and that TAB was the

sole owner of or had a first lien on those receivables. If the court granted a second lien deed of trust on All Trac's real property, Allied agreed to purchase all the outstanding and unpaid TAB accounts and TAB's security interest in TAB accounts. Upon the purchase, TAB agreed to assign the accounts to Allied. TAB agreed that Allied would collect all of All Trac's accounts receivable, including TAB accounts. TAB agreed that it would not collect any of the Allied accounts either directly or indirectly. Allied would forward funds for TAB accounts to TAB. If any TAB account remained unpaid ninety days after the entry of the agreed temporary restraining order, All Trac would purchase the account from TAB. For a ninety-day period, All Trac agreed to pay Allied a fee of 3% of the receivables, rather than the contract rate of 2.5%. All Trac and TAB terminated their banking relationship. All Trac further agreed not to purchase fuel and obtain driver cash advances or truck repairs from TAB. By separate court order, also entered October 1, 2002, the court directed that All Trac's shippers and customers send payments directly to Allied for all accounts receivable sold to TAB or Allied.

All Trac contends that the TRO notwithstanding, TAB continued to collect accounts to January 15, 2003; failed to turn over collected funds to Allied or All Trac to January 15, 2003; and failed to provide customers with notarized releases.

 As found above, TAB did collect accounts after the entry of the temporary restraining order. The order mandated that all accounts be paid to Allied. The court charged Allied with the task of forwarding funds on TAB-purchased accounts to TAB. The court entered the order upon the agreement of the parties, including TAB. TAB should have collected no funds. By collecting funds, TAB knowingly violated the court order.

Until the contemplated buyout, funds collected by Allied on TAB accounts would be forwarded to TAB. Consequently, had TAB collected or received funds after the entry of the order, but retained funds attributable to its purchased accounts while forwarding funds to Allied attributable to Allied purchased accounts or to All Trac for non-factored accounts, the violation would have been ameliorated. The evidence does not establish that TAB acted to mitigate its violation of the court order.

The order directed that upon entry of a final order granting All Trac's motion to factor with Allied, Allied would "immediately" buy out TAB's position. The court's temporary restraining order stabilized the parties' relationship. All Trac would continue to factor with Allied. Customers would pay all accounts to Allied. Allied would separate payments between its accounts and TAB's accounts, transferring funds on TAB's accounts to TAB. By collecting accounts in violation of the order and then not ameliorating the violation, TAB de-stabilized and undermined the order it agreed to follow. TAB acted in disregard of the court's order. By violating the court's order, TAB disregarded the rule of law.

After the buyout, TAB retained ownership of several accounts. According to exhibit 157, those accounts totaled $29,950.30. Pursuant to the October 1, 2002, order, Allied should have collected those accounts. If TAB did not receive full payment within ninety days, the order mandated that All Trac re-purchase the accounts. Nevertheless, TAB collected those accounts. That violated the court order.

TAB knew the provisions of the court's order. TAB did not seek relief from the court's order. TAB acted deliberately and knowingly. TAB had no justification to

act directly contrary to the court's directive. The court holds TAB in contempt of court for violating the order entered October 1, 2002.

All Trac further contends that TAB violated the order by failing to send notarized releases to All Trac's customers. In the September 19, 2002, letters to All Trac's customers, TAB told the customers to make all payments to TAB unless TAB notified them to the contrary by notarized statements. All Trac contends that the temporary restraining order mandated that TAB provide the notarized statements. The order does not compel that action. The order states: "[All Trac's] shippers and customers shall be notified, by separate court order, also entered today, that such shippers shall send payment directly to Allied for all accounts receivable sold to TAB and Allied." The court entered that order on October 1, 2002. The court did not direct TAB to serve the order on All Trac's customers. All Trac has not established that TAB violated the court's order by not providing notarized releases to customers. The court's order remedied the violation by TAB of the order entered September 9, 2002, caused by the September 19, 2002, letters.

### Contempt Damages

 " 'Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained.' " *American Airlines*, 228 F.3d at 585 (quoting *United States v. United Mine Workers of America*, 330 U.S. 258, 303–04, 67 S.Ct. 677, 91 L.Ed. 884 (1947)). A court has broad discretion when assessing damages for civil contempt. *Id.* " 'The purpose is to compensate for the damages sustained. The public rights that the said court orders sought to protect are impor-

tant measures of the remedy.' " *Id.* (quoting *Long Island Rail. Co. v. Brotherhood of Rail. Trainmen*, 298 F.Supp. 1347 (E.D.N.Y.1969)). Compensation for damages sustained includes actual pecuniary losses. *American Airlines*, 228 F.3d at 586.

 All Trac contends that it lost profits. Damages for "lost profits must be proved with 'reasonable certainty.' " *Hollywood Fantasy Corp. v. Gabor*, 151 F.3d 203, 213 (5th Cir.1998) (quoting *Texas Instruments, Inc. v. Teletron Energy Mgmt., Inc.*, 877 S.W.2d 276, 279 (Tex.1994)).

> [A]nticipated profits cannot be recovered where they are dependent upon uncertain and changing conditions, such as market fluctuations, or the chances of business, or where there is no evidence from which they may be intelligently estimated. So evidence to establish profits must not be uncertain or speculative. It is not necessary that profits should be susceptible of exact calculation, it is sufficient that there be data from which they may be ascertained with a reasonable degree of certainty and exactness.

*Texas Instruments*, 877 S.W.2d at 279 (citations omitted in original).

 "The fact that the business in question does not have a profit history is not dispositive, ... but the estimates 'must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained.' " *Thompson and Wallace of Memphis, Inc. v. Falconwood Corp.*, 100 F.3d 429, 435 (5th Cir.1996) (quoting *Holt Atherton Indus. v. Heine*, 835 S.W.2d 80, 84 (Tex.1992)).

All Trac has discontinued its long haul trucking business and has confirmed a Chapter 11 plan of reorganization. Consequently, TAB cannot now be compelled to comply with the automatic stay or the

court's orders. TAB may be compelled, however, to compensate All Trac for losses sustained. In pre-trial discovery, All Trac specified four categories of damages: (1) buyout overcharge of $5,153.09, (2) Allied surcharge of $5,698.80, (3) lost net profits through April 30, 2003, updated at trial to $427,050.00, and (4) lost net future profits from May 1, 2003, through December 31, 2005, updated at trial to $2,298,177.00. By order rendered May 19, 2003, the court held:

> If there are itemized matters that are presented, be it this particular list or any additional stay violations that may have been itemized, the plaintiff/debtor has to provide damages with reference to supporting documents or any itemized damages will be deemed waived and the case will only go to trial on the lost profits damages .... [I]f there's not going to be a Rule 26 report showing the damages for those itemized issues, they are simply off the table, and in essence, the case goes to trial on the lost profits.

Tr. of Proceedings (Court's Ruling) at 2–4, *In re All Trac Transportation, Inc.,* case no. 02–03390 (Bankr.N.D.Tex. May 19, 2003).

All Trac is, therefore, limited to these four categories of damages.

The court has found that the buyout adjustment of $5,153.09 on October 31, 2002, did not violate the automatic stay or a court order. All Trac is, therefore, not entitled to recover that amount.

■ The court has found that TAB violated the court's order entered September 9, 2002. That led to the entry of the temporary restraining order on October 1, 2002, which increased Allied's fees by $5,698.80. TAB violated that order, too. But for TAB's actions, All Trac would not have incurred that expense. TAB must compensate All Trac for the expense of $5,698.80.

All Trac primarily contends that TAB's violations of the automatic stay and the court orders deprived All Trac of cash that should have been available to fund its post-petition operations. Had those funds been available, All Trac asserts that it would have maintained its historical operating levels. All Trac argues that maintaining its business, in turn, would have generated sufficient cash flow to make adequate protection payments to its secured creditors. That, All Trac argues, would have allowed All Trac to preserve its rolling stock. All Trac further argues that this post-petition operation would have enabled All Trac to successfully formulate and confirm a Chapter 11 plan of reorganization. Without the cash flow, All Trac argues that it lacked sufficient funds to maintain historical operations and, by October 2002, lacked funds to make adequate protection payments to its secured creditors. When All Trac failed to make its adequate protection payments, the secured creditors obtained relief from the automatic stay. All Trac lost its tractors and trailers. As its rolling stock depleted, All Trac could not maintain customers. All Trac ceased its long haul operations in February 2003.

■ All Trac has not established, however, the deprivation of cash flow by TAB's acts in violation of the automatic stay and/or court orders caused All Trac to eventually terminate its long haul trucking operations. Frakes testified that All Trac filed its bankruptcy petition on August 13, 2002, because of cash flow problems. All Trac's financial condition when it filed its bankruptcy petition cannot be attributed to TAB. Frakes testified that fuel costs depleted available cash to service secured debt. Frakes testified that All Trac needed relief from its secured debt. Frakes suggested that at least one of All Trac's major secured creditors acknowledged All

Trac's need for Chapter 11 relief. Frakes further testified that All Trac needed to reduce its headquarters and other overhead expenses.

Frakes' testimony confirms pre-petition accounting analysis of All Trac. In January 2002, All Trac retained Bell & Company, an accounting firm, to prepare a financial compilation report for TAB's consideration in issuing a letter of credit to All Trac. Jeff Lovelady, a staff accountant with Bell, compiled All Trac's financial data for 2001. Lovelady gathered the data from All Trac's management, separately verifying only All Trac's loan balances. Joe Chancey, a CPA and Bell's partner in charge of the All Trac project, testified that in a compilation report the accountant takes management's financial numbers, compiles them on a cash basis into a financial statement and then discusses the data. Chancey reported that certain conditions at All Trac indicated that it may be unable to continue as a going concern within the next twelve months without a change in operations or a capital infusion. In 2001, All Trac's cash flow from operations basically covered its operating expenses and current liabilities. However, in 2002, current maturities on long term debt would add $861,614 to current liabilities. All Trac appeared unable to cover those expenses from operations. Richard Bell, a CPA who co-signed the report, concurred with Chancey. Bell also observed that he estimated that All Trac could not liquidate its rolling stock to cover the debt on that equipment.

Nevertheless, Frakes anticipated that with Chapter 11 relief, All Trac would have the opportunity to attempt to reorganize. Frakes knew that All Trac would not make debt service payments on its trucks and trailers until a plan of reorganization could be confirmed. Frakes figured that All Trac would have several months before negotiating adequate protection payments for its secured creditors. Frakes contemplated that TAB could not make distributions on pre-petition TAB or TCH debt. Frakes testified that All Trac would reduce its overhead expenses in Chapter 11. Frakes concluded that cash flow from TAB would thereby enable All Trac to successfully navigate the first couple of months of its bankruptcy case.

All Trac did not establish how Frakes' theory of his Chapter 11 case would work. On August 13, 2002, All Trac filed a bankruptcy petition because of insufficient cash flow to maintain its operations. All Trac thereby acknowledged the Bell & Company conclusion that All Trac's cash flow did not allow it to maintain its operations. All Trac's petition froze pre-petition debt service and payment of its drivers and fuel providers.

But All Trac continued to use its rolling stock. All Trac's secured creditors closely monitored and actively participated in the case. They did not seek immediate stay relief or adequate protection payments, even though All Trac used the rolling stock daily. Had they acted sooner or more aggressively, All Trac may have been required to make earlier or larger adequate protection payments.

To understand the position of the secured creditors, the court reviews the several motions to lift stay filed in the bankruptcy case.

The first motion for relief from stay was not filed until October 16, 2002, by PACCAR Financial Corporation. Other motions for relief from stay followed on October 22, 2002, by CitiCapital Commercial Corporation, December 23, 2002, by Popular Leasing, January 6, 2002, by U.S. Bancorp Leasing and Financial, and February 19, 2003, by Phoenixcor, Inc. Phoenixcor had filed a Motion for Approval of Agreement to Provide Adequate Protection on

November 25, 2002, almost three months before it filed its motion for relief from stay. All of these secured creditors, except Popular Leasing, held security interests in trucks and/or trailers. Popular Leasing's collateral consisted of a truck assignment system, truck balancers, tire inflation systems, and hubcaps. The court entered orders directing All Trac to make adequate protection payments and to maintain insurance on the trucks and trailers. All Trac was to make its first adequate protection payments under the court's orders as follows: to PACCAR no later than December 16, 2002; to CitiCapital by December 9, 2002; to U.S. Bancorp on January 15, 2003; and to Phoenixcor on December 15, 2002.

All Trac failed to make the December 16, 2002, adequate protection payment to PACCAR, even after a notice was issued pursuant to the court's order. Accordingly, the automatic stay as applicable to PACCAR and the trucks was terminated. PACCAR filed its notice of termination of the automatic stay on January 21, 2003.

All Trac failed to timely make adequate protection payments to CitiCapital as required under the court's January 16, 2003, order. Accordingly, the automatic stay as applicable to CitiCapital and its collateral was terminated. CitiCapital filed its notice of termination of the automatic stay on January 30, 2003.

An agreed order granting Popular Leasing's motion for relief from stay was entered on May 6, 2003.

All Trac failed to make any of the adequate protection payments to U.S. Bancorp as required under the agreed order conditioning the motion for relief from stay. Accordingly, the automatic stay as applicable to U.S. Bancorp and its collateral was terminated. U.S. Bancorp filed its notice of termination of the automatic stay on March 12, 2003.

All Trac failed to timely make the adequate protection payment due to Phoenixcor on December 15, 2002. All Trac paid the December adequate protection payment after Phoenixcor inquired as to its payment. All Trac then failed to make the adequate protection payment due on January 15, 2003. An agreed order was entered March 16, 2003, that modified the automatic stay as to the tractors so that All Trac would surrender all of the tractors that were collateral to Phoenixcor within three days of the entry of the agreed order.

This history reflects that All Trac did not encounter a lift stay motion until October 16, 2002, and had no obligation to make an adequate protection payment until December 9, 2002.

Keith O. Hussey, All Trac's chief financial officer, testified that All Trac should have had an additional $243,750.00 cash from revenue deprived by TAB's actions from August 13, 2002, through February 2003. Hussey testified that All Trac would have been able to use that cash to stabilize its business while pursuing Frakes' reorganization strategy. But Hussey recognized that with additional cash, All Trac would have encountered earlier adequate protection payment obligations. He figured adequate protection payments of $15,000 per month beginning in October 2002. However, he understated the likely position of the secured creditors had that additional cash actually been available.

Of the $243,750.00 Hussey testified should have been additional cash from lost revenue for All Trac, from the August 13, 2002, petition date through December 31, 2002, Hussey opined that TAB deprived All Trac of $133,575 of revenue. Yet, despite the use of the rolling stock, regular adequate protection payments did not begin until December 9, 2002, with most

regular payments scheduled after January 1, 2003. So the court must consider the cost of rolling stock from August 13, 2002, through December 31, 2002.

Assuming all of that post-petition revenue would have been recoverable, the court would expect All Trac's secured creditors to have pursued adequate protection payments earlier and more aggressively. The court considered a sample of minimum payments to figure the monthly cost of the rolling stock during the initial months of the case. The court ordered payment of $4,450 for PACCAR in December and thereafter. The court ordered payment of $25,940 for CitiCapital on December 9, 2002, which averages $8,647 for three months of the case. The court further ordered payment to CitiCapital of $3,900 on January 15, 2003, plus an additional January payment of $9,840. The court ordered payment of $6,900 for U.S. Bancorp beginning in January 2003. And the court ordered payment of $4,560 for Phoenixcor beginning in December. Considering those payments as a reasonable measure of adequate protection, All Trac would have aggregate monthly payments ranging from $24,557 to $29,650, with the likely budget amount of $25,750. For four and one-half months, those payments would have been in the vicinity of $116,000. Hussey testified that he assumed payments of $15,000 beginning in October, even if the creditors had not requested it. The court has drawn a measurement of those costs from the adequate protection orders entered in the case. That assessment virtually exhausts the additional cash Hussey projected through December 2002. The court has also inferred that the secured creditors would have indeed sought those adequate protection payments from the petition date had the cash flow supported All Trac's ability to make payments. All Trac's attorney successfully negotiated delayed adequate protection payments because of the cash flow problems; but that does not support an analysis that the cost of the rolling stock would not have substantially depleted any additional cash or that the secured creditors would have waited if the additional cash flow existed.

Hussey calculated that TAB paid pre-petition fuel debt of $24,334.30. Hussey assumed that those funds should have been available for All Trac's post-petition operations. But the court has found that the fuel payments would not have been recoverable either because of the timing of payments, lack of notice to TAB or court order.

Thus, with regard to Frakes' reorganization scenario, All Trac has not established that the availability of TAB-held funds would have left All Trac in any better net position beginning January 1, 2003, than All Trac found itself without those funds. All Trac filed its bankruptcy case with cash flow deficiencies insufficient to service its secured debt; those problems would have remained.

Frakes testified that operational difficulties caused by TAB's actions resulted in the loss of All Trac customers. Hussey prepared a chart suggesting lost customers and reduced business from customers. But All Trac presented no direct evidence from any customers about the cessation of business, let alone the reasons for any cessation of business. All Trac did not present live testimony, deposition testimony or even interrogatory responses from any customers that would establish that a customer terminated or reduced business with All Trac which could be attributed to TAB-related actions.

Furthermore, All Trac replaced TAB with Allied as its factor beginning by court order entered September 9, 2002. All Trac has produced no direct customer evi-

dence that any customer curtailed doing business with All Trac between August 13, 2002, and September 9, 2002. All Trac has not established that it significantly lost drivers during that period. All Trac did not have to make adequate protection payments during that period. Yet, All Trac did not show why its business did not stabilize after it began factoring with Allied.

All Trac sought a source of fuel different from TCH, namely, Comdata. All Trac needed to raise funds to meet Comdata's demand for a deposit. Frakes testified that he and his wife used $20,000 of their personal funds to obtain Comdata's services in September 2002. All Trac, therefore, obtained fuel services from Comdata. Had the additional cash been available from TAB, All Trac would have used its funds, not Frakes' funds, to secure Comdata, but the net effect would have been the same for All Trac, namely, an alternative source of fuel.

Thus, by September 13, 2002, All Trac had alternative financing from Allied and alternative fuel services from Comdata, and time from its secured creditors. All Trac did not establish the loss of a customer base. Four weeks into the bankruptcy case, All Trac positioned itself to continue its business without TAB, if it could overcome the problems that caused it to file its bankruptcy petition.

Hussey opined, however, that TAB's actions had a cumulative adverse impact on All Trac that eventually caused All Trac to discontinue its long haul trucking business. Indeed, the court has found a series of actions after September 9, 2002, that violated the stay and court orders, with a resulting delay in the Allied buyout of TAB, the delay in some collections of receivables and the exercise of control over some revenue by TAB. All Trac argues that resulted in an inability to make the adequate protection payments as they became due.

The court recognizes that the availability of additional revenue would have aided All Trac in making the adequate protection payments. But, as the court has found above, All Trac has understated the likely position of the secured creditors had All Trac's available cash been greater earlier in the case. The adequate protection obligations likely would have occurred earlier and in a greater amount.

Nevertheless, assuming no change in adequate protection payments from those reflected by the actual court orders, All Trac has failed to establish why its post-September 9, 2002, trucking business with Allied factoring did not result in sufficient income to address secured creditor obligations. All Trac defaulted on its December 16, 2002, $4,450 payment to PACCAR. All Trac paid its $4,560 December 15, 2002, payment to Phoenixcor late, and defaulted on its January 15, 2002, payment. All Trac defaulted on its January obligation to CitiCapital and then later to U.S. Bancorp. TAB's exercise of control over All Trac's interest in property deprived All Trac of funds that would have been sufficient to make those payments. As noted below, curiously, All Trac has not requested recovery of those amounts as compensatory damages. Instead, as Hussey testified, All Trac contends that TAB alone caused All Trac to default on All Trac's adequate protection payment obligations and that, in turn, caused the termination of All Trac's truck hauling business. While TAB's actions deprived All Trac of funds that would have covered those obligations and thus may have been the basis for itemized compensatory damages, All Trac has not established that it necessarily follows that TAB caused All Trac to default on the payments resulting in the termination of the business.

For example, All Trac did not make a $4,450 payment to PACCAR on December 16, 2002. All Trac had been factoring with Allied since September 9, 2002. All Trac had a fuel supply source. All Trac has not established that it had actually lost customers. As found above, at most, All Trac had lost one driver attributable to TAB. All Trac has not established why its business operations were insufficient to make that payment. Thus, while the TAB-controlled funds would have covered the payment, All Trac has not shown why it nevertheless could not make the payment from its continuing operations. Without that showing, All Trac has not established that TAB caused the termination of its business. The same analysis applies to the January 2003 defaults.

On this record, All Trac has not established that TAB caused it to terminate its long haul trucking operations.

All Trac requests damages for lost net profits of $427,050.00 through April 30, 2003, and lost net future profits of $2,298,177.00 from May 1, 2003, through December 31, 2005. All Trac did not specify alternative measures of damages in these categories. Because All Trac has not established the prerequisite finding that TAB's violations of the automatic stay and court orders caused All Trac to terminate its long haul trucking operation, TAB could not have caused All Trac lost profits measured by a cessation of All Trac's trucking business. TAB argues, in addition, that lost net future profits is not a proper measure of compensatory damages. For the reasons stated below, All Trac has failed to meet its burden of proof that its lost net future profits would have been $2,298,177.00. The court therefore does not determine whether lost net future profits would be a proper measure of compensatory damages.

All Trac has not explained, either in pretrial proceedings or during the trial, why it did not alternatively request itemized damages for particular stay or order violations. For example, Hussey testified that All Trac should have had an additional $243,750.00 for lost revenue from TAB from the petition date through February 2003. That amount included the $11,456.47 license fee payment. All Trac attributes that total amount to violations of the stay and court orders. Yet, All Trac did not itemize any of that amount as damages. Similarly, All Trac faults TAB for paying $24,334.30 of pre-petition TCH fuel charges. Yet, All Trac did not itemize that amount as damages. Hussey testified that TAB should have made available a net total of $259,266.30 which All Trac could have used for adequate protection payments. Yet, All Trac did not itemize that amount as damages, either. All Trac did not itemize the defaulted adequate protection payments as damages. All Trac could have itemized damages attributable to a stay or order violation. All Trac elected, instead, to attempt to affix the entire blame for the demise of its trucking business solely on TAB and, then, seek to prove and recover lost profits from TAB. By doing so, All Trac placed its recovery of damages on its ability to establish those specified lost profits with reasonable certainty.

Hussey testified about the amount of lost net profits and lost net future profits. Over TAB's objection, the court recognized Hussey's expertise to make accounting calculations of profits based on assumptions provided by Frakes. Hussey has been a licensed certified public accountant in Texas for twenty-nine years. He has served as a controller, accountant and financial officer of various corporations during those three decades. He is qualified to analyze financial data to calculate present profits and to project future profits. That analy-

sis assists the fact finder. Fed.R.Evid. 702. On the other hand, Hussey lacked expertise in the trucking industry, having been All Trac's chief financial officer only since October 2002, and having no other experience in the trucking business. The court recognized Frakes as an expert in the trucking industry based on his years of experience in that business. Frakes provided Hussey with market and operating assumptions for the trucking business that Hussey used in his analysis.

The evolution of Hussey's analysis demonstrates the difficulty in predicting future profits. Hussey's calculations changed over time with changing assumptions. All Trac provided TAB with changed assumptions as late as May 7, 2003. TAB objected to the timing of the submission of changed assumptions. On April 4, 2003, the court set the trial docket call for June 9, 2003. On April 25, 2003, the court entered an order setting the trial for June 16, 2003, thereby eliminating the need for the trial docket call. The trial began on June 16, 2003. The May 7, 2003, assumptions indeed came late. Nevertheless, because of the difficulty in predicting the future, the court has considered them.

 While reasonable people in the trucking business and their accountants may differ on marketing and operational assumptions and resulting financial calculations and predictions, TAB established that Hussey's calculations contained several flaws. Those flaws undermine the weight of his opinion. The opinion consequently does not support his conclusion of the amounts of lost net profits and lost net future profits. The court cannot, therefore, enter findings of facts establishing those damages. All Trac has not presented alternative measures of damages. The court cannot makes its own calculations of lost profits and lost future profits on this record. As a result, All Trac has not met

its burden of proof of establishing with reasonable certainty lost net profits of $427,050.00 and lost net future profits of $2,298,177.00.

In his lost profits analysis, Hussey assumed that had TAB not caused a cash flow drain, All Trac could have made its adequate protection payments and sustained its pre-petition level of operations. But, as found above, a net available cash assumption begs a fundamental question concerning the timing and amount of adequate protection payments to allow All Trac to attempt to reorganize. All Trac filed its bankruptcy petition because its cash flow did not allow it to continue to operate at historical levels without suspending payments of the rolling stock needed to sustain that historical operation. TAB played no role in those cash flow problems. Hussey assumed that with the bankruptcy petition, All Trac would receive a cash flow level from TAB factoring, would reduce its operating expenses, would continue to use its rolling stock to service customers, but would delay or minimize having to pay for that rolling stock by adequate protection payments or otherwise. For the reasons discussed above, the court cannot assume that All Trac would have realized a meaningful net cash difference during this period that would have flowed toward profits.

Throughout the period of August 2002 through February 2003, Hussey amended All Trac's monthly operating reports filed in the underlying bankruptcy case. The amended reports show All Trac losses exceeding the amount Hussey attributes to lost revenue from TAB by $230,000. Hussey testified that the monthly operating reports include depreciation on the rolling stock, which he said should be removed from the analysis. He conceded, however, that even with that adjustment, All Trac still lost $70,000 more than he attributes to

TAB. Dan Jackson, a certified public accountant with the consulting firm of Alix Partners, LLC, testified that economic reality requires that an analysis of lost income include all the expenses of operating the business. Although All Trac moved to strike his testimony, the court considers the testimony properly limited pursuant to the court's rulings on expert testimony and discovery. The expenses include depreciation to measure the cost of the rolling stock. Hussey did not substantially consider the expenses of All Trac's revenue-generating vehicles and equipment. The cost of the rolling stock virtually depletes the additional cash attributable to TAB's actions, as demonstrated by the amended monthly operating reports. Thus, as reflected by the amended monthly operating reports, with adjustments for increased income but maintaining depreciation, All Trac has not established that it would have been profitable in those months.

In his calculation of lost net future profits, Hussey did not include the cost of the rolling stock. He projected future profits from May 1, 2003, through December 31, 2005. He figured that All Trac would confirm a plan of reorganization that would satisfy secured creditors. He further assumed that All Trac would not incur expenses of acquiring rolling stock for the three years following confirmation of a plan of reorganization. He thereupon concluded that All Trac would not have expenses for trucks and trailers until after December 31, 2005. As Jackson testified, to consider incremental net revenue, the court must consider the incremental costs of running the enterprise. The costs must include the incremental costs of the trucks and trailers. The omission undermines the weight to be given to the calculation of lost net future profits.

Without including the cost of the trucks for running a trucking business, All Trac has not established its lost profits. Chapter 11 does not erase those costs from a net income profit analysis as if lifting the page of a magic slate.

The court considers two alternative means of measuring those costs. All Trac's amended schedule D of creditors holding secured claims, filed on October 23, 2003, shows that secured creditors with trucks and trailers as collateral claim in total approximately $2,245,431.60. The value of the trucks and trailers that are the collateral securing those claims was valued on amended schedule D at $1,997,000.00. Thus, the unsecured portion of the secured creditors' claims is approximately $248,431.60. All Trac intended to reduce the amount of secured debt to pay in a plan to the value of the collateral. Assuming All Trac correctly valued the trucks and trailers at less than the debt, the remainder would be unsecured claims to be addressed in the plan of reorganization. Hussey opined that future profits through 2005 would be $2,298,177, without considering any payments for the rolling stock. Hussey assumed the rolling stock would have been paid. That would have had to occur through a confirmable plan of reorganization. The confirmed plan would have paid the present value of the collateral. But the creditors would have correctly required that the projected profits be used to pay the remaining unsecured portion of their claims. The court must assume that Frakes would not have retained his equity in All Trac without paying as much of the projected profits as needed to pay the creditors in full. By doing so, All Trac would have functionally and effectively paid for its rolling stock for Hussey's projected three years. The resulting lost net profits, if any, would have been necessarily and inevitably significantly less than the Hussey calculation. Stat-

ed another way, Jackson testified that Hussey's calculation of lost net future profits would not pay All Trac's pre-petition debt.

However, as Jackson opined, it is difficult to predict how the plan confirmation process would have evolved. The better approach would be to factor the replacement of equipment into the projections of future income and future expenses. Rather than attempt to predict the interplay of restructured secured debt in the analysis of net income through 2005, the cost of the trucks and trailers should be factored as operating expenses. Frakes assumed operations at historical levels using thirty-five trucks. Hussey should have included incremental but phased costs of those trucks through 2005. Again, the resulting lost net profits, if any, would have been necessarily and inevitably significantly less than the Hussey calculation.

Hussey included a number of Frakes' assumptions about operating expenses, revenue and the trucking industry. Frakes assumed that All Trac would operate at historical levels, with historical revenue and driver cost per mile. Frakes further assumed that All Trac's capacity would sustain predicted market growth. Although TAB challenged several of the assumptions, Frakes' experience and Hussey's calculations support the approach to operation levels, capacity and market trends. But Frakes and Hussey both recognized that variable costs could affect profits.

Hussey assumed that if fuel costs rose, All Trac would pass those costs on to its customers. Frakes testified that customers customarily did not begin paying for the increased cost until three to five months after All Trac incurred those expenses. Also, not all customers agree to pay the increased fuel costs. As a result, operating expenses can periodically spike.

Hussey did not factor that into his calculations.

Further, Hussey did not include headquarters' operating expenses in calculating net profits. Jackson testified those expenses must be included to accurately predict net income. The business must have general and administrative expenses. Hussey did not include them because Frakes assumed those expenses would be paid by revenues from sources other than the long haul trucking business. But Jackson explained that profits for a long haul trucking business must include the expenses of operating that business. Thus, for example, the trucking business required the services of a dispatcher directing operations from a headquarters' office. Hussey did not include that type of administrative expense. This record does not contain an evidentiary basis to exclude general and administrative expenses from operating expenses to determine lost net future profits.

With the omission of the costs of the rolling stock, the fluctuations of fuel increase recoveries and general and administrative expenses, the court cannot accord weight to Hussey's opinion of lost net profits from August 13, 2002, through April 30, 2003, of $427,050 and lost net future profits from May 1, 2003, through December 31, 2005, of $2,298,177.00. Therefore, All Trac has not met its burden of proving lost net profits and lost net future profits with reasonable certainty.

**Summary of Stay and Order Violations**

In summary, TAB did not violate the automatic stay by not honoring All Trac checks on August 14, 2002; by paying pre-petition fuel charges on August 13, 15 and 16, 2002; in the manner that it purchased accounts post-petition; by negotiating for releases of claims; in the manner of controlling post-petition fuel card access and use; by suspending access to online bank-

ing and information; by holding funds in escrow to cover resubmitted checks; and by applying funds to complete the buyout on October 31, 2002.

TAB violated the automatic stay by paying pre-petition fuel charges on August 14, 2002, but the violation does not constitute contempt.

TAB violated the automatic stay for which it would be subject to contempt by paying the pre-petition license fee claim; by the letters to All Trac's customers dated August 15, 2002, and September 19, 2002; by exercising control over property of the bankruptcy estate transferred by Frakes; by not honoring All Trac checks in September 2002; by applying the balance of the demand account at the end of September including the September 16, 2002, amount, to All Trac's pre-petition line of credit; by selling back accounts to All Trac for amounts greater than the amounts advanced as payments for the accounts by TAB; by selling back accounts before the expiration of ninety days; and by retaining funds from Allied after October 31, 2002, without a showing that the funds derived from non-assigned accounts.

With regard to the collection of funds, TAB violated the stay for which it would be subject to contempt by collecting funds from September 11, 2002, to October 1, 2002, without disbursing the funds to Allied or All Trac. TAB did not violate the stay by collecting funds from October 1, 2002, to October 24, 2002, if derived from accounts dated before September 11, 2002. TAB violated the automatic stay for which it would be subject to contempt for collecting funds after October 24, 2002, without disbursing them to Allied or All Trac. With regard to collection of non-factored accounts, TAB violated the automatic stay by collecting non-factored accounts after September 9, 2002, for which it would be

subject to contempt, especially after October 24, 2002.

TAB did not violate court orders by the manner it purchased accounts from August 15 to August 19, 2002; in the manner of controlling the post-petition fuel card access and use; and by not sending notarized releases to customers following the September 19, 2002, letters.

TAB violated court orders for which it would be subject to contempt by the September 19, 2002, letters; by collecting and retaining funds after September 9, 2002; and by asserting a first lien on accounts on or about September 18, 2002.

After All Trac filed the Allied motion, this summary demonstrates that TAB emphasized collection resulting in the significant stay and order violations. TAB refused to honor All Trac checks despite the availability of funds, sent the customer letters, applied the demand account balance to the letter of credit, continued to collect accounts contrary to court order, engaged in negotiations and asserted positions contrary to court order.

For the contemptuous violations of the stay and orders, All Trac has established damages of $5,698.80. All Trac has failed to establish under its burden of proof that TAB caused All Trac to terminate its long haul trucking business. All Trac has also failed to establish under its burden of proof the lost net profits and the lost net future profits it claimed.

Under the pre-trial order, All Trac requested that the court issue an order to show cause why TAB should not be held in contempt of court. The parties contemplated that the court would proceed under former Bankruptcy Rule 9020. That rule was amended in 2001. Rule 9020 covering contempt proceedings now provides that Bankruptcy Rule 9014 governs a motion for an order of contempt made by a party

in interest, here, All Trac. This adversary proceeding meets all the due process requirements of Rule 9014. No further proceedings are needed.

## Tortious Interference

All Trac asserts that it should recover actual and punitive damages for TAB's tortious interference with its business and business relations. All Trac asserts claims for tortious interference with its contracts with Allied, with its customers, with its drivers, with its secured creditors and with its business-decision making. In the pre-trial order entered by the court on June 20, 2003, TAB asserts that the tortious interference claims are not before the court. TAB objected to each of these claims being included in the pre-trial order as contested issues of fact or law.

All Trac's original complaint filed September 23, 2002, alleged claims for tortious interference. On March 4, 2003, All Trac filed an amended complaint seeking a declaratory judgment that TAB violated the automatic stay and court orders and an order to show cause why TAB should not be held in contempt of court. All Trac requested compensatory damages. All Trac argues that its amended complaint also preserves the tortious interference claims. TAB argues that the amended pleading does not preserve the tortious interference claims. TAB contends that the amended pleading presents a contempt proceeding under 11 U.S.C. § 105(a) for violations of the automatic stay and court orders. However, the amended complaint at paragraphs 44 and 45 expressly alleged the tortious interference with contracts claim. The court, therefore, overrules TAB's objection to the pre-trial order, and considers the claim.

All Trac asserts that the court should apply the Texas law of tortious interference with contracts. TAB maintains that Utah law applies.

■ Under Texas law, to prevail on a claim of tortious interference, All Trac must prove that: (1) a contract subject to interference exists, (2) the alleged act of interference was willful and intentional, (3) the willful and intentional act proximately caused damage, and (4) actual damage or loss occurred. *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Ctrs., Inc.*, 200 F.3d 307, 316 (5th Cir.2000); *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex.1997); *Graham v. Mary Kay, Inc.*, 25 S.W.3d 749, 753 (Tex.App.— Houston [14th Dist.] 2000).

■ Under Utah law, "tortious interference" is generally called "intentional interference with economic/contractual/business relations." To establish intentional interference with economic relations, All Trac must prove (1) "that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff." *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982). In the cause of action, "improper purpose" is established by showing that the actor's predominant purpose was to injure the complaining party. The plaintiff must prove that the defendant's ill will predominated over all legitimate economic motivations, and, in a case of mixed motives, a court must determine the defendant's predominant purpose underlying his conduct. *U.P.C., Inc. v. R.O.A. General, Inc.*, 990 P.2d 945, 956 (Utah App.1999). "Improper means" is shown when the defendant's means of interference were contrary to statutory, regulatory, or common law or violated an established standard of a trade or profession." *Id.* at 957. "A party is subject to liability for an intentional interference with *present* contractual relations if he intentionally and improperly causes

one of the parties not to perform the contract." *St. Benedict's Dev't Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 201 (Utah 1991).

■■■ Under the Factoring Agreement, the parties agreed that Utah law would govern. The agreement provides: "This Agreement and all transactions contemplated hereunder and/or evidenced hereby shall be governed by, construed under and enforced in accordance with the internal laws of the State of Utah." ¶ 19. However, a suit on a tort is not a suit on the agreement or on a transaction contemplated under the agreement. Accordingly, a suit on a tort is not governed by the contractual choice of law provision. *In re Consolidated Capital Equities Corp.*, 143 B.R. 80, 84 (Bankr.N.D.Tex.1992). The Factoring Agreement provision for Utah law does not control. The court must therefore determine whether to apply Texas or Utah law. To make that determination, the court must apply the law of the state with the most significant relationship to the events at issue. *Id.* at 85.

■■■ All Trac's headquarters and its principal place of business are in Texas. All Trac houses its rolling stock in and operates its long haul trucking business out of Texas. When not on the road, All Trac's employees are located in Texas. All Trac's officers and headquarters' personnel operated out of Texas. All Trac's customers were located throughout the country. All Trac made deliveries throughout the country. TAB is located in Utah. Factoring with TAB and banking with TAB went through TAB's operations in Utah. Allied is located in Texas. Factoring with Allied went through Allied's operations in Texas. Weighing these facts, the court concludes that Texas had the most significant relationship to the challenged actions. The court therefore applies Texas law.

## Contract with Allied

■■■ By order entered September 9, 2002, the court authorized All Trac to enter, on an interim basis, a factoring and security agreement with Allied. The court extended that interim authorization by orders entered October 7, 2002, and October 18, 2002. By order entered October 21, 2002, the court granted All Trac's motion to enter a factoring and security agreement with Allied. All Trac contends that TAB willfully and intentionally interfered with All Trac's contractual relationship with Allied, damaging All Trac.

As found above, Kim Moore of Allied testified that TAB's buyout demands in September 2002 resulted in a price greater than 100% of the advances. Allied would not buy out TAB at that level. But the negotiations included a letter of credit that All Trac did not need to resolve with TAB in the buyout. TAB's negotiation posture for the buyout, attempting to resolve as many of TAB's financial and other concerns as possible, cannot amount to an interference with All Trac's contractual relationship with Allied. All Trac's relationship with Allied included a buyout of TAB's position. The buyout necessarily required negotiations. Parties naturally seek the most favorable resolution from their perspective in entering negotiations.

■■■ However, at the same time, TAB sent its September 19, 2002, letter to All Trac's customers. On September 18, 2002, Moore e-mailed Harding at TAB about directions to customers to pay Allied. Yet, on September 19, 2002, TAB sent its letter directing customers to pay TAB. Moore testified that Allied did not know TAB would send those letters. Given the parties' impasse in negotiations over the buyout, Allied concluded that its relationship with All Trac had been jeopardized by TAB's letters to All Trac's customers. Al-

lied considered "walking" from the All Trac contract or requesting that the court authorize All Trac to provide additional collateral.

As found above, the letters violated the automatic stay and a court order. TAB knowingly and deliberately sent the letters. The letters were false and misleading. Considering the totality of the circumstances, the court infers that TAB knew the letters would adversely impact Allied. TAB asserted ownership interest in accounts in conflict with Allied purchases. With a court order directing payments to Allied and the parties in negotiations over the buyout, TAB knowingly chose to demand that All Trac's customers pay TAB, threatening the customers, in effect, with multiple liability if they did not pay TAB. TAB willfully and intentionally thereby interfered with All Trac's contractual relationship with Allied.

Allied demanded additional collateral from All Trac. Moore testified that Allied considered the buyout with TAB, as a result of TAB's negotiating posture and the letters, as atypical. Trammel, Allied's president, confirmed that Allied's problems with TAB's letters resulted in Allied's demand for additional collateral. The court granted Allied a second lien on All Trac's real estate, over the objections of the first lienholder. All Trac incurred unnecessary professional expenses litigating the request to grant the second lien. In addition, the court granted Allied a temporary ninety-day increased factor fee of one half percent to compensate Allied for the time and expenses caused by the TAB interference. That increased fee cost All Trac $5,698.80. All Trac therefore suffered damages of $5,698.80 plus professional fees and expenses incurred pursuing court authorization to provide the additional collateral to Allied.

TAB asserts that All Trac waived its tortious interference claim by not specifying damages during discovery. As found above, All Trac did specify the surcharge damage of $5,698.80. Consequently, All Trac did not waive this component of its claim. All Trac requested recovery of attorney's fees. The court bifurcated the attorney's fees issue at trial. But the attorney's fees relate to the prosecution of this litigation. All Trac did not specify in discovery its attorney's fees and expenses incurred pursuing court authorization to provide the additional collateral to Allied. All Trac has, therefore, waived the attorney's fees component of these damages.

All Trac has established that TAB tortiously interfered with All Trac's contractual relationship with Allied.

### Contracts With Customers

All Trac asserts that TAB tortiously interfered with All Trac's contracts with its customers, by TAB's letters of August 15, 2002, and September 19, 2002. All Trac had contractual relations with its customers. Although the court has found above that the August 15, 2002, letters violated the automatic stay, All Trac introduced no evidence that the letters adversely affected All Trac's relationship with any of its customers. The August 15, 2002, letters consequently did not constitute a tortious interference with customer contracts.

 As found above, TAB had no business reasons to send the September 19, 2002, letter to customers. Worse, as the court has found, the letters were false and misleading. TAB violated the automatic stay and a court order by sending the letters. TAB intended to inform customers that TAB owned all All Trac accounts, knowing that was false. TAB intended to compel customers to pay TAB, knowing the court ordered payments to Allied. TAB knowingly took these acts intending to collect from All Trac's customers.

Carr testified that she called several customers about the letters. She said that customers expressed confusion about where to make payments. She testified that one customer, Bear Transportation, would not pay because of the confusion. Bear Transportation eventually paid its account, but after ninety days. Frakes also testified that Schneider Transportation had declined to pay until the situation had been resolved. All Trac did not present evidence of any other type of damage caused by the letters to the customers. All Trac did not present evidence from the customers that the letters damaged All Trac's reputation with the customers or caused a customer to curtail business with All Trac.

The delayed payments damaged All Trac. But All Trac did not present evidence quantifying those damages. All Trac did not present evidence of the impact of not having these payments during the delay period. All Trac did not present evidence of the cost of Carr's time addressing customers' concerns about the letters.

Furthermore, All Trac did not specify damages for this claim as required by the court to preserve recovery on this claim.

The court therefore finds and concludes that TAB tortiously interfered with All Trac's customers by sending the September 19, 2002, letters, but that All Trac failed to prove the amount of the resulting damages.

### Contracts With Employees

■ All Trac had contractual relationships with its truck drivers. All Trac contends that TAB tortiously interfered with these contracts by not honoring payroll checks on August 14, 2002, and by causing fuel card use problems. As found above, the automatic stay prohibited TAB from honoring checks drawn pre-petition. Nevertheless, subsequently, All Trac resubmit-

ted the checks and TAB honored them. All drivers were paid.

The drivers testified that they had the checks timely cashed. All Trac encountered the difficulties when the checks did not clear. All Trac had to address the problems, not the drivers.

As found above, All Trac's drivers did face intermittent problems with the use of the fuel cards. All Trac's authority to use TAB's cash collateral had been conditioned on a budget. TAB reasonably monitored the budget by a daily limit to the fuel card. By August 27, 2002, All Trac imposed its own limit on the drivers' use of the fuel card, to assure compliance with the budgeted restrictions. The Frakes–Ellis incident did disrupt business operations, with an impact on TCH. On this record, with the findings made above, the court cannot find that TAB acted willfully and intentionally with regard to the drivers.

Frakes testified that only one driver left because of fuel card problems—Harris. As found above, Harris found a five-hour delay caused by lack of access to the fuel card intolerable. Harris testified that he would not be late for deliveries or pickups. As a result, he resigned effective August 25, 2002. But he stopped driving on August 19, 2002, less than a full week after the filing of the bankruptcy petition, and on the heels of the transitional cash collateral hearings and the Frakes–Ellis incident. He also acknowledged that he had a pay issue with All Trac as well. Harris anticipated a pay raise on August 1, 2002, which he did not receive. He would have eventually resigned if he did not receive the pay raise. While Harris resigned after the fuel card disruption, All Trac has not established that TAB's actions caused the resignation.

All Trac has not established that TAB tortiously interfered with All Trac's contractual relationships with its drivers.

## Interference With Creditors and Business

All Trac had contractual obligations with its secured creditors. Those creditors held purchase money security interests in All Trac's rolling stock or leased the stock to All Trac. All Trac contends that TAB tortiously interfered with All Trac's ability to timely pay adequate protection to those creditors.

Cash flow deficiencies caused by All Trac's operations, the cost of fuel, and obligations to creditors caused All Trac to file its bankruptcy petition on August 13, 2002. TAB played no part in All Trac's decision to file its bankruptcy case. All Trac did not make its contractual payment obligations to the secured creditors. Frakes testified that All Trac intended to use Chapter 11 of the Bankruptcy Code to restructure its obligations to the secured creditors. Other than purchase accounts under substantially similar terms as it did pre-petition, All Trac had no expectation that TAB would play a role in restructuring All Trac's obligations to its secured creditors.

All Trac negotiated a series of agreements with its secured creditors for adequate protection payments. The first payment came due on December 9, 2002. All Trac contends that TAB's handling of the reserve account with funds unavailable for All Trac's use interfered with All Trac's obligations to make the adequate protection payments. All Trac defaulted on several adequate protection payments, causing the automatic stay to lift. All Trac argues that had TAB made the funds available, All Trac would have made the adequate protection payments.

By September 11, 2002, All Trac factored its accounts with Allied. All Trac has not established that the cash flow generated by Allied's purchase of accounts would not be sufficient to address adequate protection payments beginning December 9, 2002. Furthermore, the court has addressed above the impact of TAB's handling of the reserve account on adequate protection payments and the difficulty of assessing the level of adequate protection payments had All Trac's available cash been different.

In any event, court-ordered adequate protection payments do not create a contractual relationship between the debtor and the secured creditor. The contractual relation existed pre-petition and had been disrupted by the debtor's bankruptcy petition. All Trac, the debtor, expressly intended to restructure the contractual relationship. Thus, while TAB may have violated the automatic stay and court orders in its handling of All Trac's interest in funds, All Trac has not established that TAB willfully and intentionally acted to interfere with All Trac's contracts with its secured creditors. The impact on All Trac may have affected All Trac's ability to make adequate protection payments, but TAB's actions do not amount to an interference with All Trac's contracts with its secured creditors.

All Trac finally but ultimately contends that TAB's deprivation of cash flow to All Trac resulted in the demise of All Trac's business. All Trac argues that TAB thereby tortiously interfered with its contracts by interfering with All Trac's business decisions. On this claim, All Trac has not established the contracts subject to the interference nor that TAB acted willfully or intentionally to interfere with such contracts. While certain of TAB's actions did deprive All Trac of property that should have been available for post-petition operational uses under the auspices of its bankruptcy protection, All Trac has not established a cause of action for tortious interference with contracts by interfering with All Trac's business decisions.

## Punitive Damages

█ All Trac seeks punitive damages on its claim for tortious interference. All Trac established that TAB tortiously interfered with its contractual relationship with Allied. Under Texas law, to recover punitive damages for tortious interference, All Trac must prove that TAB acted with actual malice. From September 1, 1995, until August 31, 2003, the time period in which TAB's tortious interference occurred, Texas law defined "malice" as:

(A) a specific intent by the defendant to cause substantial injury to the claimant; or

(B) an act or omission:

(i) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(ii) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

*Tex. Civ. Prac. & Rem.Code*, § 41.001(7) (Vernon 1995).[1]

█ Actual malice in the context of tortious interference is described in Texas case law as " 'ill-will, spite, evil motive, or purposing [sic] the injury of another.' " *Texas Beef Cattle Co. v. Green,* 921 S.W.2d 203, 210 (Tex.1996) (quoting *Clements v. Withers,* 437 S.W.2d 818, 822 (Tex.1969) and also noting that the Texas Legislature redefined malice as it relates to the recovery of exemplary damages in causes accruing after September 1, 1995). *See also Knox v. Taylor,* 992 S.W.2d 40, 59 (Tex. App.—Houston 1999, no pet.); *Exxon*

*Corp. v. Allsup,* 808 S.W.2d 648, 661 (Tex. App.—Corpus Christi 1991, writ denied).

█ All Trac has not established that TAB acted with malice in its interference with the Allied contract. After All Trac filed the Allied motion, TAB engaged in collection efforts and negotiations that resulted in the interference. But TAB did not act to harm All Trac; it acted to collect its debt and resolve claims. In doing so, it committed a tort and also violated court orders, but All Trac did not establish that TAB acted with ill-will, spite, evil motive or with the intent to injure All Trac. The court does not award punitive damages.

## Other Issues

█ For purposes of completeness, the court addresses the impact of applying Utah law. Under Utah law, All Trac would not prevail on its claim of tortious interference with Allied, as TAB did not cause Allied not to perform its contract. Allied did perform, albeit at a greater cost to All Trac. But Utah law only permits recovery for interfering with a present contract if TAB intentionally and improperly caused Allied not to perform. Similarly, All Trac would not prevail on its tortious interference with the customers' claim, as TAB did not cause the customers not to perform their contracts. The customers did perform, albeit two customers delayed payments on their contracts because of TAB's actions. Again, that does not meet the Utah test for interfering with a present contract. With regard to the other tortious interference claims, as All Trac did not meet the Texas test, it also did not meet the Utah test.

---

1. The definition of malice, effective September 1, 2003, is "a specific intent by the defendant to cause substantial injury or harm to the claimant." *Tex. Civ. Prac. & Rem.Code,* § 41.001(7) (Vernon 2003).

### Summary

All Trac has established that TAB tortiously interfered with its contractual relationship with Allied, causing recoverable damages of $5,698.80. All Trac has established that TAB tortiously interfered with its contracts with customers but All Trac failed to prove resulting damages. All Trac did not establish that TAB tortiously interfered with All Trac's contracts with its employees or secured creditors. All Trac did not establish a claim for tortious interference with contracts regarding business decisions. All Trac is not entitled to punitive damages.

### Conclusion and Order

Despite the stark contrast of the parties' perspectives in this case, in the final analysis, All Trac's requested recovery turns on whether All Trac met its burden of proof. All Trac has attempted to catapult TAB's conflicting approach and actions into the sole cause for the termination of All Trac's trucking business. While All Trac has established several instances of stay and court order violations by TAB, All Trac did not establish that TAB caused All Trac's business to fail or that All Trac suffered the lost profits claimed by All Trac as a result. Instead, All Trac has established that it is entitled to compensable damages of $5,698.80 for contempt of court or, alternatively, tortious interference with a contract.

In its first amended complaint, All Trac requested the recovery of its attorney's fees for prosecuting this litigation. All Trac preserved that request in the pretrial order. The court bifurcated the attorney's fee issue. Within twenty-one days from the date of entry of this order, All Trac shall serve and file a brief with an affidavit in a format consistent with a fee application under 11 U.S.C. § 330 addressing its attorney's fee request. TAB shall serve and file a response within fourteen days of service of All Trac's brief and affidavit. All Trac may serve and file a reply within seven days of service of TAB's response. The court will decide the attorney's fee issue on the pleadings, unless it orders otherwise.

Based on the foregoing,

**IT IS ORDERED** that All Trac Transportation, Inc., shall have a judgment of $5,698.80 against Transportation Alliance Bank. The judgment shall bear pre-judgment interest of 1.73% from September 23, 2002, the date of the filing of the complaint. The judgment shall bear post-judgment interest at the applicable federal rate at the time of entry of the judgment. The parties shall address the attorney's fee issue as directed in the above opinion. Counsel for All Trac shall submit a proposed final judgment after the determination of the request for attorney's fees.